**In the Matter of MID–CENTER REDE-VELOPMENT CORP. et al., Debtors.**

**No. B–1115–70.**

United States District Court, D. New Jersey.

Oct. 4, 1974.

As Amended Oct. 7, 1974.

7. *Cf*. Williams v. Matthews Co., 499 F.2d 819, 829 (8th Cir.), petition for cert. filed, 43 U.S.L.W. 3217 (U.S. Sept. 18, 1974) (No. 74–296).

Bracken & Craig, by John J. Bracken, Newark, N.J., for petitioners.

Ravin & Ravin by David N. Ravin, Newark, N.J., for debtors.

Kleinberg, Moroney, Masterson & Schacter by James E. Masterson, Newark, N.J., for receiver.

## OPINION

LACEY, District Judge:

Before this court for a second time is a petition for review of an order in bankruptcy, entered in a Chapter XI proceeding, rejecting petitioners' claims to the stock of Gregory Park Section III (GP 3), an apartment dwelling and a corporation wholly owned by the debtors herein.* These claims arose from the

---

* The petitioners have properly proceeded by petition for review under 11 U.S.C. § 67(c), § 39(c) of the Bankruptcy Act. Rule 11-62 of the recently adopted Rules of Bankruptcy Procedure, which relates to district court review of bankruptcy court determinations in Chapter XI proceedings, and which provides a new appeals procedure therefor by reference to Rules 801-14, did not become effective until July 1, 1974. The petition for re-

debtors' conceded failure to honor their agreement to pledge said stock with petitioners under a blank assignment and with the power to sell on default of the underlying loan secured by this stock.[1] This proceeding is but one of many pending before this court involving these debtors, resulting from the financial difficulties of Arthur H. Padula and his several closely held real estate enterprises.[2]

There follows, in opinion form, this court's findings of fact consistent with its role on this review, and its conclusions of law, under Fed.R.Civ.P. 52.

## THE PARTIES

Petitioners are seven individuals (hereinafter referred to sometimes as the Birnbaums) who, as a group, loaned money to Arthur H. Padula Construction Corporation (Padula Construction). Padula Construction and Mid-Center Redevelopment Corporation (Mid-Center) are sister corporations, the stock of which, subject to qualifying shares, is owned by Arthur H. Padula (Padula), and both, along with Padula, are the debtors involved in the within Chapter XI proceedings. Because of Padula's complete and undiluted control of Mid-Center and Padula Construction, this opinion will use the terms "debtors" and "Padula" interchangeably.

## PRIOR PROCEEDINGS

On July 23, 1973 the Bankruptcy Judge, upon the application of the Chapter XI Receiver, had declared the debtors' pledge of GP 3 stock to the Birnbaums a nullity as to the Receiver. Thereafter, upon review in this court, additional facts had been developed which suggested that the debtors had not been completely candid with the Receiver or the bankruptcy court. Thus, for example, the Bankruptcy Judge had been first led to believe that on December 10, 1966 the authorized and outstanding stock of GP 3 consisted exclusively of 1000 shares issued to and owned by Mid-Center. In fact, since November 1966, unknown to the Birnbaums, and prior to their loan to Padula Construction, there were outstanding simultaneously GP 3 stock certificates (Nos. 5 and 7) representing 1000 shares issued to Mid-Center, and another GP 3 certificate (No. 8), also for 1000 shares, issued to Arthur H. Padula. By an unreported opinion dated January 3, 1974, and an order entered thereon, dated February 22, 1974, this court remanded the matter to the Bankruptcy Judge "for further consideration in light of the additional facts revealed, and for the taking of such additional testimony as he may deem appropriate". Following remand, the Bankruptcy

---

view herein was filed on June 24, 1974. Moreover, even if the filing were untimely, the fact that this matter was previously before me on petition for review and was remanded for further consideration, following which petitioners return to this court, leads me to conclude that the application of the new Rules here would "work injustice". *See* Supreme Court Order of the October 1973 Term, para. 2, promulgating the Chapter XI Rules.

1. The various records of the debtors indicate, as hereinafter detailed, that Mid-Center Redevelopment Corporation owned 1000 shares of GP 3 and that, while they were outstanding, 1000 shares were issued to Arthur H. Padula as well. Hence at this juncture it is simply said that GP 3 was "owned by the debtors".

2. These matters are detailed in the following: United States v. Gregory Park Section

2, Inc., 373 F.Supp. 317 (D.N.J.1974) (granting foreclosure upon FHA mortgage upon Gregory Park Section 2, Inc. a high rise apartment complex); United States v. Padula, Civ. No. 74–156 (April 3, 1974) (appointing temporary receiver for Weequahic Park Plaza and Weequahic Park Tower pending foreclosure action); United States v. Gregory Park Section 3, Inc., Civ. No. 1734–73 (February 22, 1974) (appointing a temporary receiver for rents and profits for GP 3 pending Government's foreclosure action); United States v. Neiwirth, 370 F. Supp. 929 (D.N.J.1974) (denying Receiver's motion to dismiss); Gregory Park Section 3, Inc. v. Lynn, Civ. No. 1562–73 (December 10, 1973) (denying defendant's motion to dismiss); United States v. Gregory Park Section 2, Inc., 373 F.Supp. 317 (1973) (appointing temporary receiver for Gregory Park Section 2, Inc. and determining his powers).

Judge held an additional hearing on March 26, 1974; and in an opinion dated June 19, 1974 rejected petitioners' claim to the GP 3 stock and reaffirmed his previous order of July 23, 1973, voiding the controverted pledge. The petitioners then filed their petition for review on June 24, 1974, and on July 1, 1974 the Bankruptcy Judge filed a Certificate of Review, setting forth as follows the issues to be determined:

1. Did the Bankruptcy Court commit error when it ruled that the pledge of stock made by the debtor to Birnbaum et als., was an unperfected security interest under N.J.S.A. 12A:9–301 et seq.?

2. Does the Judgment of the Superior Court of New Jersey filed on January 2, 1971, approximately 3 months and 2 weeks after the petition under Chapter XI was filed on September 18, 1970, avoid the four (4) month preference provisions of Section 60 of the Bankruptcy Act.

3. Did the Bankruptcy Court commit error in denying the Birnbaum, et als. application to declare a constructive trust in their favor in the 100% shares of stock issued by Gregory Park Section III, Inc.?

In this court, on this review, petitioners assert only that the Bankruptcy Judge erred as to issue No. 3, and abandon their claims related to issues Nos. 1 and 2.

### SCOPE OF REVIEW IN THIS PROCEEDING.

Upon this review, as stated, petitioners advance only their constructive trust claim. In so doing they challenge not only the Bankruptcy Judge's Conclusions of Law, but, as well, his Findings of Fact. To ascertain the appropriate standard of review of those factual determinations, it is to be noted initially that, on this review, jurisdiction is conferred upon this court by § 2a(10) of the Bankruptcy Act, 11 U.S.C. § 11a(10), which empowers the court to

[c]onsider records, findings, and orders certified to the judges by referees, and confirm, modify, or reverse such findings and orders, or return such records with instructions for further proceedings . . . .

Implementing this statutory provision, Bankruptcy Rule 810 defines the allowable scope of review of a Bankruptcy Judge's findings of fact as follows:

Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses.[3]

In enunciating the "clearly erroneous" rule, Rule 810 does not distinguish between operative facts and ultimate findings of fact, based upon inferences from operative facts. Accordingly, of continuing precedential vitality is the holding in In re Pioch, 235 F.2d 903, 905 (3d Cir. 1956), that a finding of an intent to hinder, delay or defraud creditors is an ultimate finding of fact—one comprised of legal inferences from other

---

3. Rule 810 revises what was General Order in Bankruptcy 47, which reads as follows:
. . . [T]he report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.
It is noted that under the new Rule the district court has lost the option of taking further evidence in connection with the review. With the loss of such power, the district court, on a petition to review, functions not unlike the Court of Appeals reviewing the findings of a district court. In the latter context of traditional appellate review, a factual finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947).

facts—and thus subject to appellate review free from the "clearly erroneous" standard.

■ On the other hand, although ultimate facts may be reviewed free of the "clearly erroneous" rule, if the record reveals a reasonable basis for such findings, a reviewing court cannot reject them and substitute its own therefor simply to achieve what it regards as a more desirable result. In re Arbycraft Co., 288 F.2d 553, 556–557 (3d Cir. 1961).[4]

■ Thus, when conflicting oral testimony is presented, and a witness' credibility must be resolved, the "clearly erroneous" standard applies, and appropriate deference is due to the bankruptcy court's opportunity to observe the live witnesses and judge their credibility. *Cf.* Gov't. of the Virgin Islands v. Gereau, 502 F.2d 914, 920–21 (3d Cir. Aug. 15, 1974). On the other hand, when a finding deals with the effect of certain transactions or events, the "clearly erroneous" rule does not apply. In re Trimble Company, 479 F.2d 103, 112 (3d Cir. 1973). *See* Electric Materials Co. v. Commissioner, 242 F.2d 947, 949 (3d Cir. 1957); Adler v. Nicholas, 381 F.2d 168, 170–171 (5th Cir. 1967); Bass v. Quittner, Stutman & Treister, 381 F.2d 54, 58 (9th Cir. 1967); In re Anjopa Paper & Board Mfg. Co., 269 F.Supp. 241, 250 (S.D.N.Y. 1967). Nor does it apply when the legal consequences of undisputed acts are determined by the bankruptcy court, and a reviewing court is called upon to reason from and interpret those acts. In re Joseph Kanner Hat Co., 482 F.2d 937, 939 (2d Cir. 1973).

■ Finally, and in summary, in evaluating findings based upon evidence consisting in part of oral testimony and in part of documentation, as is true in several instances in the case *sub judice,* the following rule, applied by Judge (now Chief Judge) Kaufman, in In re Gurinsky, 105 F.Supp. 42, 44 (S.D.N.Y. 1951), aff'd, 196 F.2d 296 (2d Cir. 1952), in reviewing a bankruptcy court's findings, is appropriate:

> Where the evidence is partly oral and the balance is written or deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own, (1) if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful, or (2) if the trial judge's finding must rest exclusively on the written evidence or the undisputed facts, so that his evaluation of credibility has no significance. * * * But where the evidence supporting his finding as to any fact issue is entirely oral testimony, we may disturb that finding only in the most unusual circumstances. Orvis v. Higgins, 180 F.2d 537, 539–40 (2d Cir. 1950) (Frank, J.)

It is against this background of legal principles that this court, on this review, finds that it must hold certain findings of the Bankruptcy Judge to be "clearly erroneous", lacking any support in the record or contradicted by the documentation in evidence, and hold other findings, as well, in error, all as will be hereinafter explicated. Additionally, this court is of the view that the learned Bankruptcy Judge erred in refusing to impose a constructive trust, in favor of the petitioners, upon the GP 3 stock held by the debtors and that his decision must therefore be reversed.

## THE FACTS

The conduct of the debtors, and, more particularly, Padula, is a tableaux of false swearing, wilful breach of con-

---

4. *See also* In re Steiker, 380 F.2d 765, 768 (3d Cir. 1967) ("Though ultimate findings are subject to appellate scrutiny free of the 'clearly erroneous' rule . . . those findings should be undisturbed where they are supported by the underlying factual determinations which cumulatively satisfy the applicable standard of proof. . . ."); In re Gross Mfg. & Importing Co., 328 F.Supp. 905, 906 (D.N.J.1971); In re Calpa Products Co., 249 F.Supp. 71, 73 (E.D.Pa.), aff'd, 354 F.2d 1002 (3d Cir. 1965), cert. denied, 383 U.S. 947, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966).

tract, fraudulent concealment of vital facts, and other shabby practices. Moreover, this court is repelled by the record's reflection of Padula's vague, incredible, and often inherently self-contradictory testimony, offered to explain his misconduct as he let truth languish. This court commends the Bankruptcy Judge for his patience in this matter, and in the hearings held, notwithstanding that it finds itself in disagreement with the result he reached.

*December 10, 1966*

The discussion best begins with a closing of a loan on December 10, 1966. On that date Padula Construction borrowed $250,000 from the Birnbaums and the parties executed in connection with this transaction numerous documents, including a loan agreement pledging as security for the loan to Padula Construction Mid-Center's purported 100% of the stock of GP 3; a hypothecation agreement; Mid-Center's "Certificate of Corporate Resolutions" permitting the pledge; minutes of a meeting of Mid-Center's Board of Directors authorizing the pledge; a consent of Mid-Center's stockholders (Mr. and Mrs. Padula) thereto; and an affidavit, sworn to December 10, 1966 by Mr. and Mrs. Padula, as shareholders and as President and Vice President of Mid-Center, embodying representations of GP 3's stock ownership by Mid-Center. It is also undisputed that the aforesaid loan agreement, in addition to the pledge provision, embraced a requirement that the Birnbaums return the stock to Mid-Center upon the happening of any one of three stated events, the relevant event in this proceeding being

The execution of a contract to purchase from the FHA the building and lands presently known as Gregory Park Section 1.

Significantly, the aforementioned December 10, 1966 Padula affidavit averred that Mid-Center "is the sole stockholder of Gregory Park Section 3, Inc."; that "all the shares of stock" of GP 3 were to be delivered to Michael Bell, as agent for the Birnbaums; that Mid-Center had good title to the shares and "that no other person or persons have any interest therein"; that the stock had not been sold, pledged, or encumbered; and that Mid-Center "has the full right to deliver the said stock to Michael J. Bell, Agent . . .". The affidavit also stated that it was made "to induce Michael J. Bell, Agent, to consummate the loan of $250,000 with Arthur H. Padula Construction Corp." The audacious falsity of the sworn and unsworn averments by Padula, in both his representative capacity (for the debtor corporations), and individually, is immediately apparent.

Thus, it is undisputed that, as required by the loan agreement, GP 3 stock certificates 5 and 7, representing 1000 shares issued in the name of Mid-Center, were tendered to Mr. Bell, the Birnbaums' agent.[5] However, certificate 8, for 1000 shares, in the name of Arthur H. Padula, was issued to Padula by GP 3 on November 1, 1966, over one month prior to the debtors' execution of the aforementioned loan agreement and Padula's affidavit. Yet, at the Decem-

---

5. Certificates 5 and 7 were issued on September 2, 1965 for 100 and 900 shares, respectively. Certificate 7 bears the issue date of September 2, 1966, but this appears to be a typographical error. Certificate 5 was issued to Mid-Center upon the retirement of Certificates 1, 2 and 3 previously issued, respectively, to Padula—98 shares, his wife—1 share, and Albertus Hamm—1 share. These shares were fully endorsed by their holders and marked void across their face by Padula in his own handwriting. The record reveals that certificate 4, issued October 31, 1964, was immediately voided as a result of a typographical error. Certificates 5 and 7 were issued upon the formation of Mid-Center. Certificate 6 was issued upon that same date for 900 shares but by mistake was issued to Arthur H. Padula, and was immediately cancelled. *See* Bankruptcy Judge's Findings of Fact 15–17; Stock Certificate Book (Exh. C–1), and the individual certificates 1–7 (Exhs. C–2 through 8). *See also*, Transcript of Hearing of March 26, 1974, at 10–23.

ber 10, 1966 closing, not only did Padula not give this certificate to Mr. Bell, he did not even tell him about it. By this act of fraudulent concealment did Padula thus signal the approach he was to take throughout in his dealings with the Birnbaums, and create the situation which saw him holding certificates 5 and 7, without knowledge of the Birnbaums, from and after February 1967.

From all that appears of record, the existence of certificate 8 did not become known to the Birnbaums until this matter came to this court on the first petition for review. The Bankruptcy Judge too, when the matter was first before him, was permitted by Padula to remain ignorant of the separate existence of this certificate. The Bankruptcy Judge has now found that Padula never told anyone of the existence of certificate 8 (Fdg. of Fact 29).

### The FHA Agreement of December 30, 1966

Having thus deceived the Birnbaums in what is contemporary verbiage might be characterized as the first stage of the "set up", Padula, as the Bankruptcy Judge found (Fdg. of Fact 4), on December 30, 1966 activated the above quoted condition in the loan agreement, calling for the Birnbaums' release from pledge of Mid-Center's GP 3 stock (certificates 5 and 7), by entering into an agreement, on behalf of Padula Construction, with the FHA to purchase an apartment project known as Gregory Park Section 1. By letter of February 3, 1967, Mr. Bell, duly performing under the December 10, 1966 agreement, released from pledge and delivered certificates 5 and 7 to Padula's counsel, to be held in escrow pending consummation of the Gregory Park purchase.[6] Then, on February 10, 1967, at the closing with the FHA, Padula pledged with that agency 1000 shares of GP 3 stock, not,

however, in the form of certificates 5 and 7 owned by Mid-Center and then held in escrow by his counsel, but rather in the form of certificate 8, which designated Padula personally as the owner. (Fdg. of Fact 6). The Bankruptcy Judge found that it was "Padula's testimony" that certificate 8 (rather than 5 and 7) was tendered because the FHA required as security shares of stock representing 100% of the GP 3 stock, in his name personally (rather than in Mid-Center's name), since he, Padula, was the guarantor on the FHA-Padula Construction agreement of February 10, 1967 associated with the purchase of Gregory Park Section 1 (Fdg. of Fact 20).[7]

The Bankruptcy Judge neither credits nor rejects Padula's "testimony" offered to support his corporate chicanery, and the parties did not put into the trial record the FHA-loan documentation. However, in this court the parties, by stipulation supplementing the record, have now supplied said documentation. See Stipulation of September 11, 1974, Exhs. A, B, and J. It appears that as early as September 13, 1966 Padula may have been apprised of the fact that the FHA would require pledge of all of the stock in GP 3. Unbelievably, in the FHA documentation, Padula masquerades as the sole owner of all of the GP 3 stock (See Exh. A, Contract of Sale and Purchase, dated December 30, 1966, introductory clause; para. 5(b); amendment to para. 5. See Exh. B, dated February 10, 1967, in which Padula pledges with FHA "all of his stock in . . . GP 3"). Mid-Center's interest is not mentioned. Thus it is clear Padula lied to FHA both on December 30, 1966 and February 10, 1967, and on the latter date delivered to FHA certificate 8, which was not worth its weight.

Next, Padula, having three days before delivered certificate 8 to the FHA,

---

6. *Cf.* The Bankruptcy Judge's Finding of Fact 5; *and see* Petitioners' Appendix, at 52, and n. 8, *infra.*

7. Neither the December 30, 1966 agreement to purchase Gregory Park, Section 1, nor the

February 10, 1967 loan agreement and Padula's personal guarantee were included in the record in the bankruptcy court, but as has been elsewhere indicated, are before the court by stipulation.

personally received, by letter of February 13, 1967 from his counsel, the validly issued certificates 5 and 7 which had been delivered to the latter in escrow by the Birnbaums on February 3, 1967.[8] Notwithstanding Padula's protestations of innocence and good faith, these certificates were never cancelled. That Padula had known of and used the cancellation procedure, when certificates were actually replaced, is evidenced by the fact that other GP 3 certificates (certificates 1, 2, and 3) were thus voided by him when replaced by new certificates. (Fdg. of Fact 19). Padula's secret retention of these uncancelled certificates continued until May 1970 when, as will be hereinafter discussed, he pledged them with Public Service Electric and Gas Co. (Public Service).[9]

Given the foregoing facts relating to Padula's surreptitious switching of GP 3's stock certificates, the petitioners regard the aforementioned Padula affidavit of December 10, 1966 as striking proof of their claim that Padula, at the earliest stage, had determined consciously to, and did deceive and defraud them.

The Bankruptcy Judge, it is noted, made no findings bearing directly upon the verity of Padula's December 10, 1966 affidavit, or the debtors' commitments in the accompanying loan agreement; nor did he make a Finding of Fact as to Padula's state of mind when, on behalf of Padula Construction, he entered into the December 10, 1966 loan agreement with the Birnbaums while explicitly misleading them about the GP 3 stock certificates then issued and outstanding.[10] The Bankruptcy Judge did, however, state (Opinion, at 12):

8. This fact is not taken from the Bankruptcy Judge's findings (Cf. Fdg. of Fact 5), but is founded upon the letter of February 13, 1967 from Martin Kesselhaut, Esq. to Arthur Padula. See Stipulation of Sept. 11, 1974, para. 8, and Exh. C. In the March 26, 1974 hearing in the bankruptcy court Padula testified at one juncture that he did not know if certificates 5 and 7 had ever been returned to him by his attorney (T. 30). Then, after admitting to the court that he had the certificates in May 1970, when he pledged them to Public Service, he stated his attorney had returned them to him within one month prior to the negotiations with Public Service in 1970 (T. 30–33). The Bankruptcy Judge does not deal with or resolve the issue of when certificates 5 and 7 were delivered to Padula personally. Cf. Fdg. of Fact 5; however, it is clear that the documentary evidence, that is, the Kesselhaut letter, is determinative. See also, Padula's deposition of November 8, 1973, at 10–12, wherein he admitted having possession of certificates 5 and 7 in accordance with the Kesselhaut letter. It is also noted that Padula testified before the Bankruptcy Judge that on March 26, 1974 he had his accountant mark the stubs of certificates 5 and 7 void when the shares were returned. (T. 28–29). The stubs of those certificates prove that testimony to be false. (See Exh. C–1).

The Kesselhaut letter of February 13, 1974 indicates as copy addressees the names of at least one of the representatives of the Birnbaums. There is, however, nothing in the record to support that such a copy was ac-

tually mailed to and received by such representative, and if received, that the information therein contained had any meaning to the recipient.

9. The Bankruptcy Judge does not make a finding expressly to this effect. However, it is clear that Padula received the certificates from his attorney, out of escrow, on February 13, 1967; and there is nothing in the record to indicate that he parted with their possession until the Public Service pledge. See also Padula Deposition, November 8, 1973, at 12. None of the parties, nor the Bankruptcy Judge has considered that if Padula and his then attorney had honored the escrow agreement, the attorney would have retained certificates 5 and 7 until he saw them delivered to the FHA, as was contemplated. Instead, he turned them over to Padula; and we are not told why the spirit, if not the letter, of the escrow agreement was thus violated.

10. Cf. the Bankruptcy Judge's Conclusions of Law, Opinion at 14, where the Bankruptcy Judge states: ". . . At the time, the original loan transaction and pledge agreements were entered into, Padula intended to perform his promise . . . ." Not only is this not made as a Finding of Fact; it is a statement about Padula's state of mind which is not supported by the record and is at odds with the numerous inconsistencies in Padula's conduct throughout. Particularly significant is that when the loan was in default, and the Birnbaums brought suit in New Jersey Superior Court on the debt and to obtain performance of the promise to

. . . this Court does not condone Padula's · manipulation of the stock certificates and his non-disclosure of the existence and whereabouts of certificate number 8. Putting it mildly, I was not impressed with the manner in which he testified nor a good part of his testimony . . . .

Findings that were made by the Bankruptcy Judge which are pertinent to the petitioners' claim that Padula defrauded them, from the beginning of their relationship, are as follows:

5. [Subsequent to the December 30, 1966 agreement between Padula Construction and the FHA, and] . . . [p]ursuant to the December 10, 1966 agreement the Birnbaum et als. released the Gregory Park III stock certificates numbers 5 and 7 which represented 100% of the shares of Gregory Park III authorized to be issued. At that time the authorized issue was 1,000 shares of stock.

6. On February 10, 1967 Padula forwarded stock certificate number 8 for 1,000 shares of stock to F.H.A. This certificate was drawn pursuant to a corporate resolution and named Arthur H. Padula as the holder of said shares and was intended to replace stock certificate numbers 5 and 7.

\* \* \* \* \* \*

18. . . . on November 1, 1966 stock certificate number 8 was issued to Arthur H. Padula for 1,000 shares of stock. The stock book stub of certificate number 8 indicates that it was to replace certificates numbers 5 and 7.

The Bankruptcy Judge also found certificates 5 and 7 were never cancelled (Fdg. of Fact 19).

The petitioners vigorously attack certain of these findings. Thus they contend that on December 10, 1966 Padula lied when he stated that certificates 5 and 7 were the only GP 3 certificates issued and outstanding since certificate 8 had been issued to Padula himself on November 1, 1966, as the Bankruptcy Judge indeed found (Fdg. of Fact 18). They also claim he lied when he stated that Mid-Center owned all the GP 3 shares, 1000, issued and outstanding. Actually, the foregoing findings of the Bankruptcy Judge do not deal squarely with these crucial contentions.

Thus, Finding of Fact 5 begs the question raised by the various issues of GP 3 stock. The finding states that when the Birnbaums surrendered certificates 5 and 7 (which was on February 3, 1967), those certificates represented 100% of the 1000 shares of GP 3 stock "authorized to be issued". Yet the finding does not state how many shares were outstanding or had in fact been issued.[11] The Bankruptcy Judge found, however, that certificate 8 had been issued on November 1, 1966 (Fdg. of Fact 18). The implication thus emerging is that certificate 8, while issued, was not "authorized to be issued". Yet this implication is contradicted, or at least rendered questionable, by Finding of Fact 6 which states that certificate 8 was drawn pursuant to a corporate resolution. This court's search of the record has revealed no corporate resolution, either of Mid-Center or GP 3, or any reference to same, supporting or authorizing the November 1, 1966 issuance of certificate 8; and in this court the parties' stipulation provides that the bank-

---

pledge, the debtors (including of course Padula) fought the suit every step of the way with a usury defense. This action will be referred to hereafter. Even had the bankruptcy court's statement been made as a Finding of Fact, it would be an "ultimate fact" under In re Pioch, *supra*, reviewable free of the "clearly erroneous" rule. Under In re Arbycraft Co., *supra*, this court would of course still accept this finding if there were a reasonable basis in the record for it; however, there is none. This court does not overlook Padula's gratuitous assertions in the bankruptcy court that he had no "intention of misrepresenting" (March 26, 1974, T. 53).

11. The Bankruptcy Judge also found (Fdg. of Fact 13) that, upon incorporation, GP 3 "was authorized to issue 10,000 shares of stock . . . ."

ruptcy court's finding to the contrary is erroneous.[12]

Significantly, Padula, in these proceedings, has endeavored to establish, by his unsupported testimony, that certificate 8 was properly and duly issued. Failure to have abundant documentary support of this transaction sharply contrasts with the highly sophisticated manner in which Padula otherwise conducted his corporate affairs, under counsel's guidance, with precise evidence of corporate authority (including corporate resolutions), minutes of Board meetings, shareholder consents, and the like. The lack of documentation on certificate 8's issuance, then, can hardly be attributable to oversight, ignorance, or informality of operation;[13] it can only be due to Padula's desire to conceal essential facts from his counsel, the Birnbaums and the FHA.[14]

The debtors and the Receiver argued below, and the Bankruptcy Judge found (Fdg. of Fact 18), that the stock book stub of certificate 8 indicated that it was intended to "replace" certificates 5 and 7, a premise which would lead to the conclusion that there were never more than 1000 shares of GP 3 stock outstanding. In this court the parties have agreed that this finding is erroneous, and, acting independently, this court finds it must come to the same conclusion. The finding thus is rejected. Unlike the stub for certificate 5, which affirmatively indicates that certificate was issued to replace certificates 1, 2, and 3, the stub for certificate 8 mentions neither "replacement" nor certificates 5 or

12. In the Padula deposition of November 8, 1973, at 19–21, Padula attempted to support the issuance of certificate 8 by a reference to a GP 3 Board resolution dated July 29, 1965 empowering the president to take certain action with respect to the purchase of GP 3 (not Gregory Park 1) from the City of Jersey City. (See Dep. Exh. P–6). It is clear that this resolution does not support the issuance of certificate 8. See discussion in this court's opinion of January 3, 1974, at 10–11; and see Stipulation of September 11, 1974.

13. This highly significant conduct of Padula has of course received considerable attention, both in the bankruptcy court and in this court. Neither counsel for the debtors nor counsel for the Receiver has advanced one piece of documentation to legitimize the issuance of certificate 8. The strongest argument tendered to justify what was done is that advanced by debtors' counsel, that, as sole owner of Mid-Center, Padula was acting as Mid-Center's agent in causing certificate 8 to be issued to himself in his own name. Debtors' Br., at 4. This highly imaginative contention enjoys no factual support. Padula's representative capacity nowhere appears; and if counsel's argument is accepted, Padula, in further misleading FHA into believing he was a principal, was compounding his already egregious misconduct. Cf. Nov. 16, 1973 argument before this court, T. 72 et seq. Moreover, Padula as a witness never claimed to be acting as Mid-Center's agent. He felt he could interchange the certificates involved because he owned and con-

trolled Mid-Center. Hearing before Bankruptcy Court, March 26, 1974, T. 49. The following colloquy between the court and debtors' counsel on the November 16, 1973 argument is of interest (T. 74):

The Court: Didn't Mr. Padula have a one hundred percent equity interest in Gregory Park III when he posted this security with FIIA? Or was he defrauding FHA?

Mr. Ravin [debtors' counsel]: He was not defrauding—your question is a tough one, your Honor. He's not defrauding . . .

He was doing what they told him to do. This does not lend credence to an "agency" theory. In fact, the very making of the argument is the best demonstration of the weakness of Padula's position.

14. Debtors' counsel argue that the Birnbaums could have reviewed Padula's records and would thus have been apprised of certificate 8 had they done so. This contention is almost offensive. With what they must now mournfully look back upon as an outlook of naive simplicity, the Birnbaums relied upon Padula's word, sworn and unsworn. Can they not, without suffering sanctions, believe that Padula was acting, and would continue to act, in good faith? Is there a Watergate morality concept that superimposes itself upon the commercial relationship, as here exemplified, requiring a party to a transaction to accommodate his conduct to the assumption that the other party, and his representatives, will have no regard for old fashioned ethics or good faith or fair dealing or adherence to the virtues of honesty, verity and integrity?

7. Moreover, whereas all prior certificate stubs contain the date of issuance, stub 8 does not (although the certificate itself is dated November 1, 1966).[15] Thus, there is no indication that, when it was issued on November 1, 1966, certificate 8 was intended as a "replacement" for certificates 5 and 7. Certainly the latter documents were not then voided. If certificate 8 was intended as a "replacement", bearing in mind that 5 and 7 were issued to Mid-Center, and 8 was issued to Padula himself, the record does not indicate that any consideration passed, that there was corporate authorization (by Mid-Center) for the transfer by gift or otherwise of the GP 3 stock from Mid-Center (the owner of certificates 5 and 7) to Padula (the owner of certificate 8), or that there was any authorization for the issuance of certificate 8 to Padula as agent for Mid-Center, as he now contends he was. Debtors' Br., at 4.

It would appear that in his early negotiations with the FHA, Padula was advised he would have to pledge GP 3 stock owned by him with FHA, and that, in preparation for the closing, he adroitly caused certificate 8 to be issued on November 1, 1966. If he had then been acting in good faith, and intended "replacement", he would have immediately cancelled certificates 5 and 7, and thereafter so informed the Birnbaums who would of course have required further assurances of Padula's good faith and ability to secure their loan, and doubtless would have demanded from Padula something other than the statements of ownership of GP 3 stock by Mid-Center. Rejecting candor, Padula entered into an agreement on December 10, 1966, executing an affidavit which clearly he knew to be false.[16] He knew that he

---

15. The November 1, 1966 issue date of certificate 8 was so damaging to Padula's attempts to show he was acting in good faith that at times he testified as if the certificate was not issued until after February 3, 1967, when certificates 5 and 7 were returned to him. *See* T. 27–28 of March 26, 1974 hearing in the bankruptcy court:

> Q. Was there ever any discussion on or about February 3, 1967 of receiving back certificates 5 and 7 from the Birnbaum group for the purpose of pledging those certificates with F.H.A.?
> A. Yes there were.
> Q. Do you remember an agreement between Martin Kesselhaut and Michael J. Bell whereby certificates 5 and 7, which were in the possession of the Birnbaums, were given over to your agent for use as a pledge with the F.H.A.?
>
> *    *    *    *    *
>
> A. . . . [certificates 5 and 7 were] in the name of Mid-Center; the F.H.A. wanted the stock in my personal name, so what *we had to do was to get the stock back that the Birnbaums had in the corporate name to Mid-Center and then we issued the stock in my personal name* to meet the demands of the F.H.A. [Emphasis supplied]

16. The following examination of Mr. Padula by the bankruptcy court on March 26, 1974 concerning the execution of the December 10, 1966 Padula affidavit is illuminating in this regard (T. 50–52):

> THE COURT: Did you read this affidavit that I am referring to before you executed it?
> THE WITNESS: Yes, sir.
> THE COURT: Did you note that it referred to you as president of Mid-Center Redevelopment Corporation and your wife, Margaret C. Padula as vice-president of Mid-Center Redevelopment Corporation?
> THE WITNESS: Yes, sir.
> THE COURT: Well, didn't you know at the time that stock certificate number 8 had been issued to you personally?
> THE WITNESS: I did.
> THE COURT: Why didn't you correct this or refuse to sign it if you knew it was incorrect?
> THE WITNESS: You know, hindsight is great vision of 20–20. At that time—
> THE COURT: Now, Mr. Padula,—
> THE WITNESS: Well, you asked me a question.
> THE COURT: Yes, I am asking you why at that time you didn't correct it.
> THE WITNESS: The answer is I never even thought of it.
> THE COURT: You never thought of it?
> THE WITNESS: No. It never occurred to me at that time.
> THE COURT: Do you know the difference between your executing a document as Arthur H. Padula, period, as opposed to Arthur H. Padula, president, Mid-Center Redevelopment Corporation?
> THE WITNESS: Yes, sir, I do.

owned and planned to pledge with the FHA certificate 8 for 1000 shares, yet swore that Mid-Center was the sole shareholder of GP 3, that no other person had any interest therein, and that all the stock of GP 3 would be delivered to the Birnbaums. The Birnbaums were given certificates 5 and 7, yet Padula secretly kept the already issued certificate 8. Although he protested that he did not intend to misrepresent facts to anyone, he admitted being aware of the falsity of the affidavit. He explained his signature without correcting the affidavit as follows (Hearing in bankruptcy court, March 26, 1974, T. 53):

> I signed what I had to sign to get the money, I had no choice.

Thus, in executing the December 10, 1966 affidavit along with the loan agreement, Padula had one objective, obtaining $250,000; and, in brazen candor, he stated he was prepared to do or say whatever was required "to get the money."

As of February 1967, then, Padula had led the FHA to believe it had obtained a pledge of all of the properly issued stock of GP 3, represented by certificate 8, of which he, Padula, was the beneficial owner; and the debtors do not contend otherwise.[17] The Birnbaums, on the other hand, having surrendered to Padula's then attorney, in escrow, certificates 5 and 7 for release to the FHA, believed, as they had a right to, that they had been pledged with and were being held by the FHA, and thus out of Padula's reach. Instead, Padula himself took delivery of certificates 5 and 7 three days after certificate

8 was delivered to the FHA. Stipulation of Sept. 11, 1974, para. 8, and Exh. C.

*September 25, 1967*

On September 25, 1967 the Birnbaums (who still had no reason to doubt that the FHA possessed in pledge certificates 5 and 7) entered into a new loan agreement with Padula Construction. Padula, on behalf of Padula Construction, executed and delivered a new note in the amount of $524,000, once again secured by a pledge of 100% of the stock of GP 3, subject to the rights of the FHA. *See* Bankruptcy Judge's Fdg. of Fact 7. Again the documents executed included a loan agreement, a hypothecation agreement, minutes of a special meeting of the Board of Directors of Mid-Center agreeing to hypothecate its stock, a certificate of Mid-Center's corporate resolutions, the affidavit of Mr. and Mrs. Padula as officers of Mid-Center representing Mid-Center's title to all of the GP 3 stock, and stockholders' consents. (Exh. C–14). Section 6c of the loan agreement pledged

> 100% of the stock of Gregory Park Section 3, Inc. assigned in blank, to be delivered to you, subject only to the rights of F.H.A.

The loan agreement also contained an amendment which provided that the Birnbaums were to receive the stock of GP 3 "without notification to FHA or the mortgagee except in the event of default of the loan." The hypothecation agreement, pledging 100% of GP 3's stock, was signed "Mid-Center Redevelopment Corp. by Arthur H. Padula,

THE COURT: You do know the difference?

THE WITNESS: I do.

THE COURT: And you knew the difference on December 10, 1966, didn't you?

THE WITNESS: Yes, sir.

THE COURT: Would it make any difference to you if you were supposed to execute a document individually and someone presents the document and asks you to execute it as president of Mid-Center Redevelopment Corporation?

THE WITNESS: It is obvious that I did it, Your Honor.

THE COURT: Would it make any difference to you?

THE WITNESS: Of course it would make a difference.

17. Indeed, the Receiver's Brief meets the issue squarely. It makes no effort to justify Padula's gross misconduct, but denominates it overall as a deception only as to the FHA. *Cf.* Receiver's Br., at 13. That the FHA was being deceived is clear. *See* n. 8, *supra.*

Pres. as sole stockholder of Gregory Park Section 3, Inc." This agreement provided that the stock referred to in the loan agreement was 100% of the outstanding stock of GP 3 and that Padula would not allow GP 3 to issue additional stock unless all such additional stock was pledged to the Birnbaums. Padula's affidavit, which reiterated on behalf of Mid-Center the same representations of title in GP 3's shares as were embodied in his earlier affidavit of December 10, 1966, also provided that all the shares of GP 3 were to be delivered to Michael J. Bell

> upon the satisfaction of the present lien held by the Federal Housing Administration as hereinafter mentioned;

> That Mid-Center Redevelopment Corp. has good title to the aforementioned shares of stock and that no other person or persons have any interest therein; that the said stock has not been mortgaged, sold, pledged or hypothecated; except that said stock has been pledged to the Federal Housing Administration under our agreement with it dated February 10, 1967;

> \*    \*    \*    \*    \*    \*    .

Padula's duplicity, again manifested, exacerbated the injury done the Birnbaums several months before. By false and misleading statements, both sworn and unsworn, he continued his concealment of certificate 8, and perpetuated for the Birnbaums the notion that only Mid-Center owned GP 3's stock, and that, at that time, Mid-Center's stock was unavailable for pledge with the Birnbaums because it was in pledge with the FHA. Thus were the Birnbaums induced to agree to have their security deferred, but only while their stock was in pledge with the FHA. Obviously they did not contemplate that Padula, after February 1967, had been holding certificates 5 and 7 himself, accomplishing this corporate legerdemain by foisting off on FHA a spurious certificate, certificate 8.

The bankruptcy court made no findings respecting the verity of Padula's sworn and unsworn statements in connection with the September 25, 1967 loan agreement. A finding it did make relating to the very significant September 25, 1967 agreement is as follows:

> 7.    .    .    .    To secure payment of said obligation Padula pledged 100% of the stock of Gregory Park III, assigned in blank, subject only to the rights of F.H.A. which at the time had possession of the said pledged stock.

It is clear that at the time the FHA did not have possession of "said pledged stock" as the stock pledged on September 25, 1967 was Mid-Center's stock, while the FHA held GP 3 stock issued in Padula's name; and, under the September 25, 1967 agreement, it was not Padula, individually, but Mid-Center, by Padula, which had pledged the stock. This finding is thus clearly erroneous; it reflects a failure to consider the separate existence of uncancelled certificates 5 and 7, then in Padula's possession.[18]

The continuing fraud thus committed by Padula, and the consequent injury to the Birnbaums, is obvious. Without diminishing the gravity of Padula's misconduct in December 1966, it can be said that what he did to the Birnbaums in September 1967 was even more unconscionable.

Had Padula, even at this time, that is, September 25, 1967, shelved his policy of mendacity and deceit, and divulged all to the Birnbaums, they not only could have avoided what was to become for them an unmitigated disaster (the new loan agreement); they could have safeguarded their now obviously endangered interests under the earlier agreement.

18. This Finding of Fact 7 is identical to Finding of Fact 6 contained in the bankruptcy court's previous opinion dated September 27, 1973. This court had remanded this action for reconsideration of these facts in light of the then newly disclosed existence of the two sets of certificates. The present finding would be unassailable under the facts before the bankruptcy court at the first hearing. Now, however, it cannot be sustained.

Among other things, in the wake of the fraud perpetrated upon them in December 1966, had it not been shielded from disclosure, they now could have refused to enter the new agreement and rescinded the earlier agreement, obtaining return of their money. Certainly the loan agreement of September 25, 1967, if entered into at all, would have embraced different terms. At the very least, the Birnbaums would have had the right to review the debtors' records to ascertain the legality of the various issues of GP 3 stock. They would of course thus have been apprised of Padula's character and his manipulation of his corporations to perpetrate—and conceal—his fraud. Their search would have revealed that Padula had defrauded the FHA by pledging with it a bogus certificate issued without proper corporate authorization, without consideration, and without cancelling certificates 5 and 7, which, they would have discovered, Padula, in his individual capacity, had continued to hold after receipt thereof out of escrow from his counsel. Arguably, having found the only legally issued certificates of GP 3 to be in the name of Mid-Center, and in Padula's possession, they could have obtained possession of these certificates and thereby perfected a security interest therein to protect their rights under the December 10, 1966 agreement.[19] Thus by his continued unscrupulous behavior Padula aggravated the Birnbaums' position and made indubitably clear his continuing fraudulent intent.

Actually, the circumstances detailed to this point establish Padula's fraud, the consequent injury to the Birnbaums, and their right to relief. However, in view of the debtors' so-called "replacement" theory, having as its predicate the premise that certificate 8 was merely a "replacement" for 5 and 7, events after September 25, 1967 will next be analyzed. As will be perceived, this period was likewise permeated by Padula's blunt and harsh misconduct, unmarked by atonement, and undeserving of judicial blessing.

### Post-September 25, 1967 Events

The debtors, of course, as has been noted, claim that certificate 8 was simply a "replacement" for certificates 5 and 7, a position accepted by the Bankruptcy Judge but undercut by the circumstances as hereinabove set forth. *See* 963, *supra.* Nonetheless, so that on any appellate review this court's reasoning is fully exposed, the "replacement" argument will be accepted, *arguendo,* to show that the debtors' position ultimately is no better. Treating the case in this light requires review of events occurring after September 25, 1967.

At the outset of this portion of the court's exposition, it deserves to be mentioned once again that even if certificate 8 had been a validly issued replacement for certificates 5 and 7, Padula's averments in December 1966 and September 1967 would still be false, and obviously intended to conceal the facts from the Birnbaums.

Padula having defaulted on the Birnbaum loan, on March 12, 1969 the Birnbaums' counsel, unaware that the FHA held only Padula's certificate 8, whereas Mid-Center's certificates 5 and 7 were in Padula's possession, notified the FHA by letter that the Birnbaums had an interest in the GP 3 stock held by that agency, and requested that it be given this stock when FHA's rights therein expired. (Bankruptcy Judge's Fdg. of Fact 8). By return letter, dated March 26, 1969, the FHA responded that, upon termination of its rights, it would return the stock to the pledgor. (Bankruptcy Judge's Fdg. of Fact 19).[20]

---

19. *See* N.J.S.A. 12A:9–305.

20. This letter is open to the interpretation that FHA's rights had not yet expired. As subsequently appears, however, Padula voided certificate 8 (that given to the FHA) on January 31, 1969 pursuant to the December 30, 1966 agreement. As was later to be disclosed, FHA, in fact, had lost or misplaced certificate 8 and it was returned to Padula in 1971. (Fdg. of Fact 10).

Counsel then replied by letter of April 1, 1969, enclosing a copy of the September 25, 1967 agreement between the Birnbaums and the debtors, and warning the FHA "not to deliver any stock of Gregory Park Section 3, Inc. to anyone but my clients."[21]

The irony is plain: here was an evincing of concern about what was now a worthless certificate, while the architect of the fraudulent scheme, in default on the loans, and now under an obligation to turn over all of GP 3's stock to the Birnbaums, sat quietly holding certificates 5 and 7. Counsel did not know his was a useless exercise. As will be shown, Padula had voided certificate 8 on January 31, 1969, indicating FHA's interests therein, under their pledge agreement, had ceased. Thus the two "replaced" certificates were again viable, under the debtors' theory of this case.

At some point in 1968 or 1969, after the debtors' default, the Birnbaums commenced suit against Mid-Center, Padula Construction and Padula, individually, in Superior Court of New Jersey, seeking recovery of the balance due under the September 25, 1967 agreement and an order directing the turnover of the GP 3 stock. The Bankruptcy Judge's findings (Fdgs. of Fact 10 and 11) are to the effect that at some point after the FHA's pledge interest terminated (i. e., January 31, 1969), this suit was commenced. The parties' Stipulation of September 11, 1974, para. 2, however, is to the effect that the suit was commenced on March 20, 1968. Whichever date is accurate, it is clear that at no time after suit was commenced did Padula tell either the Birnbaums or the court of the whereabouts of certificates 5 and 7, or, after January 31, 1969, that certificates 5 and 7, under Padula's "replacement" theory, had been revitalized by reason of the voiding of certificate 8, and could at any time be put out of the Birnbaums' reach.

Undoubtedly because they believed all the GP 3 stock was held by the FHA, as reflected in their counsel's correspondence with that agency, and certainly without knowledge that Padula was holding certificates 5 and 7, the Birnbaums did not ask in their suit for interlocutory relief against Padula which would have restrained him from further deceptive utilization of said certificates. Had they at this point been advised of the fraud earlier committed and now perpetuated, they would have been able to take immediate steps before the court to obtain an interlocutory restraint which would have saved them from the next act in Padula's implausible scenario. This action, it is noted, was actually tried before New Jersey Superior Court Judge Ward J. Herbert in or about July 1969, well after certificate 8 had been voided; and an opinion was issued on July 10, 1970.

Meanwhile, less than three months prior to Judge Herbert's filing of his opinion, and on April 30, 1970, Public Service filed an action in Superior Court of New Jersey against Gregory Park 2 and GP 3 (and not against the debtors whom the Birnbaums were suing, that is, Padula Construction, Mid-Center and Padula individually) seeking to recover payment for utility services provided, and to obtain the appointment of a receiver.[22] This suit had disastrous consequences for the Birnbaums. Padula, remarkably reticent where the Birnbaums were concerned about his personally holding Mid-Center's certificates 5 and 7 of GP 3's stock, broke his tomb-

---

21. *See* Exhibit F accompanying affidavit of Joseph L. Freeman, Esq. filed with the bankruptcy court on August 9, 1972.

22. The Bankruptcy Judge incorrectly found this action to have been commenced in March 1970 (Fdg. of Fact 12). This court, in reliance on the bankruptcy court's pre-vious opinion containing an identical finding, also stated the incorrect March 1970 date in its opinion, at 5, of January 3, 1974. Subsequently, an affidavit of Michael R. Griffinger, Esq., filed February 8, 1974, and a copy of the complaint accompanying debtors' brief on remand, reveal the correct date to be April 30, 1970.

like silence to the limited degree of disclosing to Public Service that he held these shares, and then used them to achieve a speedy settlement with Public Service on May 8, 1970, under which Mid-Center as "sole stockholder" of GP 3, through Padula, its president, pledged "all of its issued and outstanding stock" of GP 3 to Public Service; [23] thereafter, pursuant to this pledge, Padula gave Public Service GP 3's certificates 5 and 7, which, to repeat, had been in his possession since early February 1967.[24]

The Bankruptcy Judge, who, it will be recalled, viewed certificate 8 as a "replacement" of certificates 5 and 7, did not make a finding on when the FHA rights in the GP 3 stock terminated. Such a finding would have been appropriate because, under the debtors' "replacement" theory, upon such termination the debtors were obliged under the September 25, 1967 agreement to return the GP 3 stock to the Birnbaums. It has been noted, however, at 968, *supra,* that the Bankruptcy Judge did find that after the "FHA's interest in the pledged stock terminated . . . .", the Birnbaums brought suit, seeking "to recover the balance due on the September 25, 1967 agreement and an order directing the . . . [debtors] to turn over the Gregory Park III stock." (Fdgs. of Fact 10–12).[25]

This court in its January 3, 1974 opinion found, based solely upon the Padula testimony in his deposition of November 8, 1973 (at 11, 15, 23–24), that the FHA rights in the pledged stock expired in February 1970 after a three-year pledge (Opinion, at 11). Facts have been developed before the bankruptcy court, however, that necessitate reconsideration of that finding.

It appears from the stubs of the stock book, and this court so finds, as has been hereinabove stated, that the FHA's rights to GP 3 stock expired January 31, 1969 since Padula had marked the stub for certificate 8 void as of that date. (Exh. C–1). This stub contains in its right-hand corner the following notation:

1/31/69 VOID

Shares void per agreement January 31, 1969—but not returned FHA misplaced shares.

Thus, while Padula testified that the FHA pledge expired in March 1970, the documentary evidence indicates that the FHA rights to the GP 3 stock expired on January 31, 1969. Although the bankruptcy court did not make a credibility finding on this point, this court accepts the documentary evidence and rejects the Padula testimony. In re Gurinsky, 105 F.Supp. 42, 44 (S.D.N.Y.

**23.** *See* Resolution of Mid-Center dated May 8, 1970; Padula Deposition of November 8, 1973 Exh. P–8; *and see* hearing before bankruptcy court, March 26, 1974. T. 41.

**24.** Padula would draw comfort from the Bankruptcy Judge's finding (Fdg. of Fact 12) that Public Service took certificates 5 and 7 "with full knowledge of the pending Superior Court suit between Birnbaum et als. and Padula." This fact is without significance, except as it may reflect unfavorably upon anyone who intentionally concealed this transaction from the Birnbaums. The critical question is: Why were the Birnbaums not advised that certificates 5 and 7 were in Padula's possession and available to be pledged? They still believed that the FHA held all of the GP 3 stock certificates. The Bankruptcy Judge, while finding the debtors' misconduct insufficient in law to justify imposition of a constructive trust,

strongly condemned it. The documentation of this transaction with Public Service is in the record in this court by Stipulation of September 11, 1974, Exhs. D and E. Like the Birnbaums' documentation (and unlike FHA's), Mid-Center is stated to be the owner of all of the stock of GP 3. It is noted that the settlement agreement, as it refers to the aforesaid pledge, provided that the parties would cooperate "to obtain the approval of any governmental agency to this pledge of stock, including the Federal Housing Authority or the Department of Housing and Urban Development." Not one word is said to reflect the interest of the Birnbaums.

**25.** The Bankruptcy Judge did not find that the Birnbaums knew when the FHA interest in the GP 3 stock had expired, and the record does not reflect that they did.

1951), aff'd., 196 F.2d 296 (2d Cir. 1952).[26]

Thus, even under the debtors' and Receiver's view of this case, when in January 1969 Padula voided the stub to certificate 8, considering the FHA rights at an end, and failed to so inform the Birnbaums or to forward to them the security to which they were entitled, the debtors were in violation of their obligations under their agreement of September 25, 1967 with the Birnbaums. Certificates 5 and 7, which Padula held, and which, by his conduct, he considered reinstated from their "replaced" status, should have been turned over to the Birnbaums, a proposition which the Receiver concedes. (Receiver's Br., at 9). Not only did he fail to do this; he withheld from them information which they could have used to protect and enforce their rights.

The debtors (and the Receiver) would justify Padula's breach of the September 25, 1967 agreement to pledge the GP 3 certificates with the Birnbaums after the FHA pledge expired by claiming that they were in litigation with the Birnbaums when the FHA pledge terminated.[27] This is not so, if the Bankruptcy Judge's Fdgs. of Fact 10 and 11 are accepted. It is true, on the other hand, under the Stipulation of September 11, 1974, which states that the Birnbaums commenced their suit on March 20, 1968 (para. 2). Even if true, however, the explanation for non-disclosure is unacceptable.

Judge Herbert's opinion, rejecting the debtors' usury defense, and granting the Birnbaums their sought for relief, reflected an uncertainty as to the whereabouts of the GP 3 stock:

> I do not recall that the record shows where the certificates representing stock of Gregory Park, Section III are located, but if in the hands of or under the control of any of the defendants, the judgment should order that they be turned over to the plaintiffs. (Bankruptcy Judge Fdg. of Fact 21)

Thereafter, and until the debtors filed their Chapter XI petition, only Padula (other than Public Service representatives) could have cured Judge Herbert's uncertainty, by informing him that the stock was not with FHA but rather had been pledged with Public Service. But Padula had again become Sphinx-like, as he readied the final scene in his drab drama of fraud. Then, on September 18, 1970, and prior to entry of judgment on Judge Herbert's opinion, Padula and his debtor corporations filed their Chapter XI petition.[28] Resolutely consistent to the end, Padula never broke his silence, related to the Birnbaums, as to certificates 5 and 7. The circle was complete. The Birnbaums now, as Padula had wrought it, would be unsecured creditors, and, upon emergence from Chapter XI, the old order would be restored, with Padula owning Mid-Center and Mid-Center owning GP 3.

Again at this stage, the debtors acted less than forthrightly: they did not even make a full disclosure to the bankruptcy court. The Birnbaums' debt is listed in the petition as unsecured; and the petition of Mid-Center, verified by

---

26. This finding is supported by the representation of counsel for the debtors before this court on oral argument on November 16, 1973 where counsel, at 56–58, stated that the pledge was for a two-year period, running from February 10, 1967.

27. *See* this court's previous opinion, at 3–4, for comment upon the manner in which the debtors resisted payment to the Birnbaums. Having entered into two separate agreements, with the borrower clearly denominated as Padula Construction, a corporation, the debtors, upon default, when sued by the Birnbaums, asserted the defense that the

loan was to an individual, Padula, and that therefore the defense of usury was available. Having thus staved off a ready resolution of the lawsuit, and with the Birnbaums still thinking that certificates 5 and 7 were with FHA, Padula was able to continue to hold GP 3's certificates 5 and 7, which he pledged with Public Service in May 1970.

28. Judgment was not entered until January 22, 1971, and it ordered that defendants turn over to plaintiffs all stock of GP 3 "which may be in their hands or under their control." (Bankruptcy Judge Fdg. of Fact 23).

Padula, lists as an asset all the stock of GP 3. *See* Mid-Center Petition, Schedule B–2. There is no mention of the fact of the pledge, or anything to suggest the rights therein of the Birnbaums, so plainly evident under the September 25, 1967 agreement, or as so recently declared by Judge Herbert.

Subsequent to the filing of the Chapter XI petition, the Birnbaums filed in the bankruptcy court a proof of claim in the amount of $642,882.73, which they alleged was secured by the stock of GP 3. Subsequently, on October 14, 1971, an order to show cause why their pledge should not be voided was directed to the Birnbaums, and the determination thereof became the genesis of this proceeding. In April 1973 the attorney for the debtors received certificates 5 and 7 from Public Service and subsequently forwarded them to the Chapter XI Receiver.[29]

### THE LAW

The bankruptcy court, in its earlier opinion of July 23, 1973, had found that since the Birnbaums, after relinquishing their pledge in February 1967, had never regained possession of the GP 3 stock, represented by certificates 5 and 7, and had not otherwise perfected their security interest, they could not take as against the Receiver on the basis of either the December 10, 1966 or the September 25, 1967 agreements. The bankruptcy court also found that the judgment of the Superior Court, entered upon Judge Herbert's opinion, did not create a lien valid against the Receiver. It found a judgment lien ineffective as being unexecuted, rejected the proposition that an equitable lien was created

that related back to September 25, 1967, the date of the agreement, and found that if any lien were created, it was invalid as a voidable preference. The bankruptcy court's opinion of June 19, 1974, in addition to reaffirming these findings, rejects the constructive trust theory, and petitioners now challenge only the determination as to their constructive trust claim.

Petitioners assert that Padula's fraudulent misconduct, on behalf of himself and his corporations, calls for imposition of a constructive trust in their favor upon the stock of GP 3 as early as December 10, 1966 and no later than the date of the pledge to Public Service, May 8, 1970, more than. four months prior to the filing of the September 18, 1970 Chapter XI petition and appointment of a Receiver. Accordingly, it is argued, the Receiver took the GP 3 shares owned by Mid-Center subject to the beneficial interest of the Birnbaums under the constructive trust, and must now deliver to them these shares.[30]

*Equity and the Constructive Trust*

The classical and still timely expression of the constructive trust doctrine is that of then Judge Cardozo for the New York State Court of Appeals in Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 386, 122 N.E. 378, 380 (1919):

> A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

---

29. *See* statement of debtors' counsel, Nov. 16, 1973, at 76, on argument before this court.

30. The Receiver's Brief accurately states the law (at 4):
> The Receiver must, of course, be particularly alert when a claimant advances a position wherein he claims to be the beneficiary under a constructive trust. Such a right, if established, is superior to the Receiver's position.

*Cf.* 4A Collier on Bankruptcy ¶ 70.62, at 695 (14th ed. 1971).

It is noted that a security interest in "instruments" [which term includes "securities", N.J.S.A. 12A:8–102(1)(a)] may be perfected by possession only, N.J.S.A. 12A:9–304(1), with exceptions here not applicable. *Cf.* Bankruptcy Judge's Opinion, at 16.

This exposition, characterized by Professor Scott as "More nearly a complete definition of a constructive trust",[31] has found favor in the courts of this state, the law of which, incidentally, all of the parties and the Bankruptcy Judge would apply to the case at bar, in view of the negotiation of the two loan agreements and all other critical events having occurred here. *See* Moses v. Moses, 140 N.J.Eq. 575, 581, 53 A.2d 805, 808 (E & A 1947); D'Ippolito v. Castoro, 51 N.J. 584, 242 A.2d 617 (1968); *Cf.* 5 Scott on Trusts, *supra*, § 462.2, at 3417.

In D'Ippolito v. Castoro, *supra*, the Supreme Court of New Jersey reversed the decision of the lower court refusing to impose a constructive trust in absence of fraud or breach of a confidential relationship. There a co-guarantor had failed to make payment of his half of the guarantee, resulting in his co-guarantor losing his home at a sheriff's sale, which home was, incidentally, purchased at a reduced price at that sale by the defaulting co-guarantor. The court found that, although there was no fraud (at the inception of the transaction or otherwise), the defendant had breached his duty, arising out of the guarantee agreement, to pay his proportionate share of the guarantee, and thereby committed a wrongful act resulting in his unjust enrichment.[32] A constructive trust was accordingly imposed upon the home.

In a portion of its opinion significant for our purposes, the court stated its view of the constructive trust doctrine (51 N.J. at 588–589, 242 A.2d at 619):

> Although Gordon v. Griffith, 113 N.J. Eq. 554, 168 A. 57 (Cr.1933) indicates that fraud is an essential element of a constructive trust, the better view as expressed in our later de-

cisions is that a constructive trust will be impressed in any case where to fail to do so will result in an unjust enrichment. Clark v. Judge, 84 N.J.Super. 35, 61, 200 A.2d 801 (Ch.1964) aff'd. o.b. 44 N.J. 550, 210 A.2d 415 (1965); 5 Bogert, Law of Trusts § 472, p. 10 (2d ed. 1965); Scott on Trusts § 462.1, p. 3417 (3d ed. 1967). Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property. *Cf.* Neiman v. Hurff, 11 N.J. 55, 93 A.2d 345 (1952). Scott on Trusts, *supra*, § 462.2, p. 3417, goes so far as to suggest that "A constructive trust may arise, however, even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it". We need not here decide, however, whether a constructive trust may arise absent any wrongdoing on the part of the alleged constructive trustee, for Castoro in failing to offer and pay one-half the debt to the principal creditor breached an obligation imposed upon him by the guaranty agreement and thus committed a wrongful act.

■ In summary, then, it may be said that "a constructive trust will be impressed in any case where to fail to do so will result in an unjust enrichment"; and where there has been a transfer of property as a result of "some wrongful act" (which need not be fraudulent in nature) or "breach of a confidential relationship". D'Ippolito v.

---

**31.** 5 Scott on Trusts § 462, at 3413 (3d ed. 1967). Professor Scott is critical of the thinking that would limit the constructive trust to cases of actual fraud or abuse of a fiduciary relationship. It was in the context of this criticism that his characterization of the *Beatty* formulation was rendered.

**32.** The court noted that, while a guarantor has no duty to "contribute by payment to

his co-guarantor any portion of a debt until the latter has paid more than his pro-rata share . . . the courts have placed a duty upon each co-guarantor to *exonerate* his fellow co-guarantors by paying his proportionate share of the joint obligation to the principal creditor . . . ." 51 N.J. at 589–590, 242 A.2d at 619 [Emphasis in original].

Castoro, *supra*, 51 N.J. at 588, 242 A.2d at 619.

*Analysis of the Opinion of the Bankruptcy Court*

While stating that he did not "condone Padula's manipulation of the stock certificates and his non-disclosure of the existence and whereabouts of certificate number 8" (Opinion, at 12), the Bankruptcy Judge was of the view that Padula's misconduct, "the fraud complained of", because it did not occur at the "inception" of the contractual relationship, did not warrant imposition of a constructive trust. (Opinion, at 13). He also determined that, absent fraud at the "inception of the transfer of the property in question" (Opinion, at 13), the only basis for imposing a constructive trust would be where it was necessary to do so in order to prevent "unjust enrichment" resulting from "breach of a confidential relationship", which he found absent in the case at bar. (Opinion, at 12). In thus holding that a constructive trust will be impressed only to prevent that unjust enrichment which results from fraud, or breach of a confidential relationship, the Bankruptcy Judge too severely constricts that remedial doctrine of equity. *See* D'Ippolito v. Castoro, *supra*. However even under this abridged conception, Padula must be deemed to have held Mid-Center's GP 3 stock as a constructive trustee from and after February 13, 1967 when he took delivery of certificates 5 and 7 out of escrow, from his counsel.

In dealing with the fraud-based application of the constructive trust doctrine, the Bankruptcy Judge stated (Opinion, at 13–14):

> Fraud, another of the tests of constructive trust has been alleged by the creditor herein. The fraud alleged must be found in the particular facts of a case. Where the fraud exists at the inception of the transfer of the property in question, the remedy of constructive trust usually applies. Here the fraud complained of did not occur when the original pledge agreement was executed but after the Birnbaum et als. had returned certificates number 5 and 7 to Padula. Padula's actions in manipulating stock certificates number 5, 7 and 8 occurred thereafter and not at the time the entire transaction was entered into. In finding a constructive trust it is essential to distinguish between the breach of a promise not fraudulently intended and the breach of a promise with no intention to perform. See 54 Am.Jur. Sec. 231 at p. 177. At the time, the original loan transaction and pledge agreements were entered into, Padula intended to perform his promise and did pledge the stock to Birnbaum et als. but he could not have known that some three and one-half years later Public Service would sue him and he would have to pledge certificates number 5 and 7 to them. The breach of promise to return 100% of the issued stock to the Birnbaum et als. after its use by F.H.A. was a breach of a promise not frauduently [sic] intended and not a breach of a promise with no intention to perform, and as such, does not warrant, on that basis, the imposing of a constructive trust on the stock.

This statement unfortunately embodies certain errors of law and fact. Thus, it is not necessary that "the fraud exists at the inception of the transfer of the property in question", 5 Scott on Trusts, *supra*, § 462.2, at 3417, as quoted in D'Ippolito v. Castoro, *supra*. Moreover, as has been demonstrated, there is no factual underpinning for the declaration that "At the time the original loan transaction and pledge agreements were entered into, Padula intended to perform his promise . . .". Indeed, the evidence against this premise, as mirrored in the wide range of Padula's pernicious behavior, is overwhelming. *See* n. 10, *supra*. Also lacking any factual support in the record (and embodied in no Finding of Fact) is the statement of the Bankruptcy Judge, in his treatment of legal principles, that "the breach of

promise to return 100% of the issued stock to the Birnbaum et als. after its use by F.H.A. was a breach of a promise not fraudulently intended and not a breach of a promise with no intention to perform" in that "he [Padula] could not have known that some three and one-half years later Public Service would sue him and he would have to pledge certificates 5 and 7 to them." This court is of the view that there is no basis for drawing the conclusion from this record that Padula intended to perform his promises when they were made. From the outset of his dealings with the Birnbaums he had, by his unswerving duplicity, corroded and subverted their relationship. And to speculate that Padula would have kept his promise to restore the Mid-Center stock in GP 3 to the Birnbaums except for the assumed requirement of the Public Service pledge is to overlook much that is germane. The FHA "pledge" terminated January 30, 1969, and the Public Service suit did not commence until fifteen months later. In the meantime, the debtors having defaulted on their loan, the Birnbaums sued them under their loan agreement, also seeking turnover of Mid-Center's GP 3 stock, which at the time the Birnbaums believed had been and was still in pledge with FHA. If, as the Bankruptcy Judge stated, Padula intended to fulfill his promise to return the stock to the Birnbaums, shelving for the moment Padula's concealment of the truth on December 10, 1966 and September 25, 1967, why did he fail to advise them after January 31, 1969, that he, and not FHA, now held certificates 5 and 7? Of even more profound implication, as a rejection of the Bankruptcy Judge's declaration of Padula's early intent, is the fact that when the Birnbaums sued him on default, Padula denied the legitimacy of the loan and asserted the defense of usury. Moreover, what is there that compelled Padula, so taciturn about the

stock with the Birnbaums, to voluntarily pledge certificates 5 and 7 with Public Service to secure payment of an indebtedness for utility services owed by certain of Padula's corporations? Indeed, the record reflects that Public Service said that it would take as security whatever Padula had; and it was he who thrust Mid-Center's GP 3 stock upon Public Service.

The primary error by the Bankruptcy Judge, however, was his failure to perceive that Padula's conduct in late 1966 and early 1967 was not simply a sequence of aimless, detached and unrelated acts, but rather a fulfillment of an overall scheme, conceived on November 1, 1966, when he caused the issuance of certificate 8 to himself, and concluding on or about February 13, 1967, when he took delivery of uncancelled certificates 5 and 7 from his counsel.

Accepting, as apparently the bankruptcy court did, and as this court does, Padula's explanation for the issuance of certificate 8, that is, necessary compliance with FHA's mandate, he thus had planned the elements of the scheme as early as November 1, 1966, when, on his own, and without the knowledge of others, he surreptitiously issued to himself GP 3's certificate 8, and retained it until delivery thereof to the FHA at closing on February 10, 1967. The certificate was worthless; and the stark fact is that Padula, by issuing it to himself, acted without authority, provided no consideration therefor, and acquired no equity in GP 3 as a result thereof. [33] *Cf.* G. Loewus & Co. v. Highland Queen Packing Co., 125 N.J.Eq. 534, 6 A.2d 545 (Ch.1939); *and see* N.J.S.A. 14A:7-4 and its antecedents, in effect in 1966.

Another strand in the contrived fabric of fraud was Padula's entry into the December 10, 1966 transaction with the Birnbaums. Notwithstanding the spuriousness of certificate 8, since Padula had not only caused it to issue, but did

---

[33]. The theme of "necessity" runs throughout Padula's misdeeds. He justifies his false statements to the Birnbaums because of the "necessity" that he get their money. He had to dupe FHA because of the "necessity" of giving it a certificate in his name. He had to give certificates 5 and 7 to Public Service, again because of "necessity".

so knowing he was going to pledge it with FHA, it is unthinkable, particularly under the "replacement" theory, that he should have concealed its issuance and existence from the Birnbaums. Yet conceal it he did. In his affidavit of December 10, 1966 expressly acknowledging his understanding of the Birnbaums' reliance thereon in extending their loan, Padula's averments are laced with lies. His representations in other documentation of that date are equally false. His purpose in concealing the existence and purpose of certificate 8 from the Birnbaums is unmistakeable. Had they known what he had done, and intended to do with it, the Birnbaums not only would have known Padula was lying to them. They also would have known, or at least suspected, that Padula, having no need, because of certificate 8, to pledge Mid-Center's certificates 5 and 7 with the FHA, would, upon getting possession of them utilize them for his own purposes. Merely to view this "manipulation" and "nondisclosure" as disquieting, or to state that such conduct is not to be "condone[d]", as the Bankruptcy Judge did (Opinion, at 12), is of little solace to those who were thereby defrauded. This court is of the view that Padula's fraudulent iniquity warrants more than the stinging verbal lashing administered by the Bankruptcy Judge. Additionally, there is undeniably required, if justice is to be done, the application of those sanctions in equity's armamentarium capable of redressing the wrongs thus committed.

Then on December 30, 1966, came the agreement with FHA. We can safely assume that Padula communicated its happening to the Birnbaums along with a request that the Birnbaums now fulfill their contractual obligation to transfer certificates 5 and 7 out of their pledge, so as to make them available for pledge with the FHA. If, as the Bankruptcy Judge found, Padula had, on December 10, 1966, and at this time, no fraudulent intent, why did he permit to pass this opportunity to fully advise the Birnbaums of the existence of certificate 8?

Thus deceived, on February 3, 1967 the Birnbaums duly performed by delivering to Padula's counsel, as agreed, certificates 5 and 7. The delivery was not unconditional, however; counsel was to hold the certificates in escrow, pending consummation of the FHA transaction and delivery was thus accepted by Padula's agent.[34] Still no word was passed to the Birnbaums of the existence and intended use of certificate 8.

Next, on February 10, 1967 Padula closed with FHA. Padula assured that agency that certificate 8, in his name, contrary to the facts as they now are known, was valid and subsisting and that it represented all of the shares of GP 3 issued and outstanding. It is equally certain he did not advise the FHA that his counsel was holding in escrow the validly issued certificates 5 and 7, issued to Mid-Center, which, shortly before, Padula had certified to the Birnbaums to be the owner of 100% of GP 3's stock.

Then, on February 13, 1967, Padula somehow persuaded his counsel, who, as the Bankruptcy Judge found, did not know of certificate 8, to violate the spirit, if not the letter, of the escrow agree-

34. Because the fraud-based application of the constructive trust doctrine is so obviously invoked by Padula's conduct, this court does not consider whether there exists in the circumstances a basis for consideration that Padula was likewise unjustly enriched by reason of a breach of a confidential relationship between him on the one hand and the Birnbaums on the other. By delivering certificates 5 and 7 to Padula's counsel in escrow, the Birnbaums, it could be argued, made him (and he agreed to become) their fiduciary. *Cf.* Colegrove v. Behrle, 63 N.J. Super. 356, 366, 164 A.2d 620, 626 (App. Div.1960); Tucker v. Dr. P. Phillips Co., 139 F.2d 601, 602 (5th Cir. 1943); 28 Am. Jur.2d Escrow § 17 (1966). Padula knew this, yet took delivery of these certificates by letter of February 13, 1967 from his counsel. It can be cogently be contended that Padula thus served also as a fiduciary for the Birnbaums in holding this stock, and that the moment he regarded it as his own beneficially he breached said confidential relationship.

ment pursuant to which the Birnbaums had delivered certificates 5 and 7 to him, and he, Padula, took possession thereof. Needless to say, except to emphasize the integrated pattern of Padula's conduct, he did not cancel these certificates as would have been appropriate if, as he now contends, they had been "replaced" by certificate 8.

Thus, by his fraudulent activity, commenced on or about November 1, 1966, Padula now had in his possession personally, to be used as he saw fit, shares owned by Mid-Center in GP 3, as evidenced by certificates 5 and 7; and, as we know, he secretly held these certificates throughout the period of the FHA "pledge", which terminated January 30, 1969, and beyond, until, on May 30, 1970, he pledged them with Public Service to secure payment of an obligation not of Mid-Center but of other corporations owned by Padula.

Under these circumstances, against the background of the case law heretofore cited, it is clear that there was fraud committed by Padula at the "inception" of his transaction with the Birnbaums and thus he held Mid-Center's shares of GP 3's stock as a constructive trustee for the Birnbaums from the time when, in violation of the escrow agreement, he took personal possession of certificates 5 and 7 on February 13, 1967, instead of putting them in pledge with the FHA.

*The Receiver's Position*

The Receiver, while frankly conceding Padula's impropriety, argues among other things that the Birnbaums had obliged themselves under the December 10, 1966 agreement to surrender certificates 5 and 7, and that their position after delivery of the certificates to Padula on February 13, 1967 was essentially that contemplated by the agreement. This presentation must be rejected. Only Mid-Center was an equity owner of GP 3. Its stock certificates evidenced this ownership. The Birnbaums were fraudulently induced by Padula's falsehoods of December 10, 1966 to believe

that he required Mid-Center's stock to pledge with FHA, where the Birnbaums' interest would be safe, subject only to FHA's rights. They delivered it to his counsel in escrow, to be released for that purpose. Instead, Padula appropriated it for his own use. He, by his fraud, unjustly enriched himself to the extent of Mid-Center's equity in GP 3.

*The "Replacement" Theory and Events After February 13, 1967*

During the factual review herein, it was indicated that even assuming *arguendo*, that certificate 8 could be considered a "replacement" for certificates 5 and 7, the debtors' position was unimproved. *See* pp. 967–970, *supra*; and this court's reasoning in that regard will now be set forth for purposes of appellate review, if any is sought.

Under the "replacement" theory, which, parenthetically, the facts completely discredit, the debtors would have this court ignore (a) the difference in ownership of certificate 8 on the one hand, and 5 and 7 on the other; (b) the falsity of Padula's statements on December 10, 1966; and (c) the secret issuance of certificate 8 without consideration therefor. Then they would contend that, even though Padula took out of escrow Mid-Center's certificates 5 and 7 uncancelled, and held them without informing the Birnbaums, he "replaced" them with certificate 8 which, when pledged with FHA, furnished the same security certificates 5 and 7 did, namely, 100% equity ownership of GP 3.

The proponents of this theory then carry their burden through the September 25, 1967 transaction when Padula maintained his silence about certificate 8. If, indeed, he intended certificate 8 to replace 5 and 7, how can his remarkable reticence about it be explaned as of this date? The sworn and unsworn averments made by Padula in connection with this loan referred only to Mid-Center stock. The Birnbaums were advised that this stock was to be pledged with them, subject only to the FHA pledge, and that the Mid-Center stock would be

restored to them when FHA's pledge rights terminated. Yet Padula, personally, was holding these shares, a fact which, if known to the Birnbaums, they would have found unsettling at the very least. Indeed, had they been alerted at this juncture to the truth, there would have been no further loans and doubtless the Birnbaums would have moved to seize certificates 5 and 7, sued to collect their money, or taken other steps in law or equity to make themselves whole.

Still riding the billowy cloud of the "replacement" theory, we come to January 30, 1969. The FHA pledge terminated. Certificate 8 was then voided by Padula. Then magically 5 and 7 were somehow reinstated or restored, again without any indication of corporate action. Now everything was ready for Padula to do what he claims to have always intended to do, even in December 1966, that is, return certificates 5 and 7 to the Birnbaums. When he failed to do so, he was, under the debtors' "replacement" theory, unjustly enriched and became a constructive trustee of certificates 5 and 7, Mid-Center's stock, which, by reason of the voiding of certificate 8 would as conceived by the debtors, be restored to their full vitality in Padula's hands.

Thereafter, as we know, Padula continued his silence about certificate 8, and his retention of 5 and 7; and let the Birnbaums labor under the mistaken notion he himself had induced, that certificates 5 and 7 were still with the FHA. Padula continued to disdain informing the Birnbaums that he held certificates 5 and 7 and eschewed their delivery; instead he resisted their suit by claiming that the loans by the Birnbaums had been, in actuality, not to Padula Construction, a corporation, but to Arthur H. Padula, individually, and that therefore a usury defense was available to him.

Thus, while this court thought it feasible to pursue to its demise the "replacement" theory, if up to January 30,

1969 the record does not dispel the rationality of the "replacement" theory, there can be no doubt of its speciousness thereafter. The validity of the "replacement" theory must rest, first, on Padula's intention that there be a replacement, and, second, and even more important, on Padula's living up to the obligations assumed by him under the December 10, 1966 and September 25, 1967 agreements. Given his unrelieved silence, through this latter period, about the true state of things, particularly, the whereabouts of certificates 5 and 7, and then his refusal to acknowledge the validity of the debt, it is inappropriate to maintain that Padula, at any stage of his relationship with the Birnbaums, intended to honor his obligations.

## CONCLUSION

As has been indicated, the only sound view of the facts of this case calls for the imposition of a constructive trust upon the Mid-Center shares in GP 3, as held by Padula, as of February 13, 1967, and a form of judgment should be submitted consistent with this determination, and providing for conveyance thereof by the Receiver to the Birnbaums. 5 Scott on Trusts, *supra*, § 481.-2, at 3466 (3d ed. 1967); *and see* Meyner v. Burlington-Bristol Bridge Co., 29 N.J. 210, 219, 148 A.2d 585, 590 (1959); 4A Collier on Bankruptcy § 70.04, at 55 (14th ed. 1971); Restatement (Second) of Trusts § 307 (1959).

While this court finds that the "replacement" theory urged by the Receiver and the debtors and adopted by the Bankruptcy Judge is without any support in the record, nonetheless, it has traced this theory to its logical conclusion and, as indicated, finds that even were this concept of the case to be adopted, the same constructive trust would be impressed, this time in January 30, 1969.

If counsel cannot agree upon the form of judgment within three days of the filing of this opinion, I will set the matter down for hearing on short notice.