Jeanne CAMPAGNA, Plaintiff,

v.

UNITED STATES, Defendant-Third Party Plaintiff,

v.

MAUTNER–GLICK CORP., Third Party Defendant.

Civ. No. 75–1574.

United States District Court,
D. New Jersey.

May 7, 1979.

Supplemental Memorandum Aug. 13, 1979.

574

Samuel Jacobs, Jersey City, N. J., for plaintiff Campagna.

Robert J. Del Tufo, U. S. Atty., Newark, N. J., by M. Carr Ferguson, Asst. Atty. Gen., and Jerome Fink, Robert G. Nath, Washington, D. C., for the United States.

Jerrold S. Fond, Hackensack, N. J., for Mautner-Glick.

## MEMORANDUM

BIUNNO, District Judge.

This case was tried before the court without a jury on a number of days between criminal jury trials as calendar conditions permitted.[1]

The findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P., appear in this opinion as allowed by that Rule.

The factual background in this case is not in serious dispute. The litigation ensues from disputes about some detail facts, about inferences and interpretations from the facts as found, and from the law applicable thereto.

Dominick Campagna had been in business as a general contractor for some years. Mautner-Glick was a real estate enterprise,

---

1. Jurisdiction over claims against and by the United States derive from the Internal Revenue Code and are federal claims. The claims by and between Jeanne Campagna and Mautner-Glick Corp., while connected with the federal tax aspects, are fundamentally state law claims with jurisdiction grounded on diversity of citizenship and more than $10,000, in controversy. As such, state law governs. Under New Jersey law, when no notice of intention to claim under the law of another jurisdiction is given, New Jersey law is to be applied. N.J.Ev.Rule 9(3). No notice was given by any party. However, there appears not to be any difference between the law of New Jersey and the law of New York applicable to this case in any event.

owning investment real estate (whether directly or through subsidiaries or affiliates), and also performed real estate management services both for that class of investment real estate and for real estate owned by others. In the course of that business, it had a volume of work consisting of the renovation of buildings, some of which work was contracted out from about 1959 to Mr. Campagna for general labor and materials, with specialty work related to each project being separately contracted to others (e. g., heating, plumbing and electrical).

Over the period from 1959 on, Mr. Campagna occasionally was ill to an extent that required his hospitalization. In these instances, a long-time friend and business associate, one John Costello, would step in to supervise and continue work then in progress until Mr. Campagna was able to return.

Mr. Campagna maintained his office in space provided to him within the Mautner-Glick offices. Whether he was charged for rent, telephone and other office expense, or whether these were provided without charge in view of the convenience of having him readily available to Mautner-Glick did not appear at trial.

In the latter part of 1971, Mr. Campagna fell ill again and was hospitalized. Again, John Costello stepped in to cover the work. On November 9, 1971, Mr. Campagna died unexpectedly. He died without a will, and his widow, Jeanne Campagna was appointed as the administratrix of his estate.

At his death, there were evidently six building projects that Mr. Campagna had under contract or under way for Mautner-Glick. Two of these, at 204–206 East 25th Street, were in initial stages, and another was hardly begun. The other three were well along. These were at 505 East 83rd Street, 521 East 88th Street, and 448 East 79th Street.

The working arrangements between Mautner-Glick and Mr. Campagna during his lifetime were evidently quite informal. As each project arose, an agreement was made for Campagna to perform specified work at some lump sum figure. These agreements were usually oral and without formal documentation. The practice shown was that Campagna would gather the various work crews and buy materials, and Mautner-Glick would provide funds by advance as "progress payments". Insofar as labor costs were concerned, it is quite clear that Mr. Campagna received funds sufficient to cover the gross wages, and he undertook to make the necessary deductions for withholding tax, F.I.C.A. tax and the like, pay the workmen their net pay, and then file returns for the withholdings with the aid of an accountant, with remittances accordingly. There is no suggestion that for any quarter before his death in November, 1971, Mr. Campagna was at any time deficient in reporting and remitting withholdings on income tax, withholdings on F.I.C.A. tax, or payments of the employer's share of F.I.C.A. taxes, not to mention state or federal unemployment taxes, or the like. The dispute arises only in respect to the final quarter of 1971 (during which Mr. Campagna died), and the first and second quarters of 1972 (by the end of which the subject projects were completed).

Having died without a will, there was no way in which Mr. Campagna's estate could undertake, as an estate, to carry on his business. When a self-employed individual like Mr. Campagna dies with a will, it is not uncommon to include provisions authorizing the personal representative to continue the business at least long enough to carry out existing commitments and preserve the "going business" value as an asset that might be sold to avoid its erosion to zero, or to a minus figure, deriving net earnings meanwhile. Having died without a will, this commonly made authorization simply did not exist.

Aside from the undisputed facts that Mr. Campagna died without a will and that Mrs. Campagna was appointed administratrix, the trial record is barren of any information about his estate. It is also clear that he was survived not only by his widow, but by a son as well. Whether there were other surviving children, or surviving issue of a deceased child or children is not clear,

although passing mention of two daughters was made by the witness Glick. Nor does it appear who was entitled to inherit his estate or in what shares. Whatever those facts may be, it is clear that his widow would have been entitled to some share of it.

In any event, it is clear and not in dispute that the renovation contracts in existence with Mautner-Glick at Mr. Campagna's death were potential estate assets—or potential liabilities. From the testimony and the reasonable inferences therefrom, it is clear that the widow regarded these contracts as potential assets and wanted to see them completed.

There were discussions between Mrs. Campagna and Mautner-Glick after Mr. Campagna's death, in regard to the outstanding projects. How many discussions there were, or when they took place, is only vaguely reflected in the testimony. That which is not in dispute are two major items: one, the newly-begun project at 204–206 East 25th Street was disposed of by what amounted to a sale of the contract to DiJon Construction for a lump sum paid to Mrs. Campagna; two, a written "Memorandum of Understanding", drafted by or for Mautner-Glick, was executed by it and Mrs. Campagna under date of November 16, 1971, covering an arrangement to continue and complete the work on the three projects in an advanced stage. The record is not clear on how the other building project was handled.

IRS Form 941 is a tax form required to be filed quarterly by employers required to withhold federal income taxes, or F.I.C.A. taxes or both, the return being due by the end of the calendar month following each calendar quarter. This appears from the instructions on IRS Form 941 as well as in the more detailed Circular E, "Employer's Tax Guide", which are judicially noticed.[2]

There are also requirements for the deposit, with an authorized financial institution or a Federal Reserve Bank, of the amount of tax withholdings and of the F.I.C.A. tax assessed against both the employee (deducted from gross pay) and the employer. The requirement for deposit payments depends on whether the aggregate of those taxes reaches specified amounts. Thus, if the total tax at the end of a quarter is less than $200., no deposits need be made and the tax is to be paid along with the IRS Form 941. On the other hand, if the tax for a given month is $200 or more (but less than $2,000) for the first or second month of any quarter, then a deposit must be made, with IRS Form 501, within 15 days of the end of that month. Finally, if the taxes for any quarter-month (weekly) period are $2,000. or more, then the deposit must be made within 3 business days after the end of the period.

The IRS Form 941 is designed to reflect the tax liability for each quarter-month (week) and for each month, as well as the dates and amounts of each deposit, for each calendar quarter. The undeposited tax for the quarter should not be more than $200. if the required deposits were made.[3]

2. The returns marked as exhibits, Exh. G–7 and G–8 are the lower segment of an 8½ × 14 inch form, the larger and upper part of which is intended to list the social security numbers, names and taxable FICA wages of each employee. This upper part, along with one of two labels to identify the employer, is evidently separated on receipt and sent to the Social Security Administration so that FICA wages may be credited to each employee's account. The lower segment, carrying the other employer identification label, form items line 10 through 23, and the date and signature, is the tax portion evidently retained by IRS. It is only this lower portion that is shown on Exh. G–7 and G–8.

The court could not locate any copy of Form 941 for 1971 and 1972, but did locate one for 1975, which it has reproduced and marked Exh. C–1, to give better understanding. The only difference between the 1975 form and the ones for 1971, 1972, is the tax rate. This was 10.4% on line 14 and 5.2% on line 15 for both 1971 and 1972. Schedule B of the form is for listing deposits of tax during the quarter.

3. These deposit requirements have varied from time to time, but as shown by Exh. G–7 and G–8, the undeposited taxes due (if any) were to be less than $200. at that time.

What the practice was in this regard during Mr. Campagna's lifetime does not appear from the record. Nor does the record disclose whether IRS Forms W–2 and W–3 (reconciliation), or Forms 1099 and 1096 (reconciliation) were filed, and by whom, for the workmen involved for the calendar year 1971 or 1972. The aggregate amounts of the W–2's should agree with the totals on the W–3, and should also match (except for the employer's share of FICA taxes) the aggregate of the four quarterly returns on IRS Form 941. However, the record is entirely silent in this regard.

As is well known, once an employer files his first return on IRS Form 941, the return form is automatically mailed to him by IRS for succeeding quarters unless appropriate indication is made on the return for a given quarter that it is a final return, or that there has been a change of ownership, or the like. It is also known that the returns mailed each quarter to listed employers carry a preprinted label with the employer's name, address and employer's identification number (EIN). This same information is required to be entered on the W–2 and W–3 forms, as well as on 1099's and the reconciling 1096.

Despite the lack of basic data in the evidential record on this score, it is beyond dispute that IRS Form 941 for the 4th quarter of 1971 was prepared by an accountant for Mrs. Campagna, who then signed the return with her deceased husband's name, and filed it with the taxes which that return showed were due. The record is not clear on who prepared the returns for the 1st and 2nd Quarters of 1972. Mrs. Campagna signed them. Mautner-Glick declined to provide checks to pay the taxes, and they were filed without payment.

■ So far as the disputes between Mrs. Campagna and the United States are concerned, this course of conduct is strong evidence that Mrs. Campagna was somehow continuing her deceased husband's business, albeit in informal and irregular fashion, either in her capacity as administratrix of the estate, or as a beneficiary of it. In the statutory sense of the Internal Revenue Code, this evidence supports the contention of the United States that she was an "employer", although in her deceased husband's name, and was accordingly liable for the ensuing taxes, interest and the like, reduced by the payments subsequently made.

Taken all together, the evidence of the arrangements and working details between Mrs. Campagna and Mautner-Glick arising out of the "Memorandum of Understanding" of November 18, 1971 does not overcome this conclusion. The IRS Form 941 carries a large, boldface caption "Employer's Quarterly Federal Tax Return". The ID block calls for name, address and "employer identification number". The report lines are itemized for reporting total wages and other compensation, income tax withheld, a calculation of the FICA tax, and so on. The final item calls for entering "FINAL" if the person reporting is not liable for returns in the future, and the instructions referred to on the same line call for an attached statement, when there is a sale or transfer of the business, of pertinent information. The form is replete with "employer" status, and it was signed and filed not once, but three times, using the name of Mr. Campagna who his widow surely knew was dead, and not using the name of Mautner-Glick.

Whatever Mrs. Campagna's experience or lack of it may have been, the inferences from the circumstances point much too strongly against her contention vis-a-vis the United States. Each return involved some kind of communication with the accountant, an execution of the form with "employer" sticking out all over it, and a filing. It strains credulity to contend that she was not an employer in the statutory sense, even though she was acting in the name of her deceased husband in an undefined capacity.

The next aspect deals with the claims as between Mrs. Campagna and Mautner-Glick. The findings and conclusions as between Mrs. Campagna and the United States are not controlling on these issues, which require evaluation from an entirely different perspective.

578

An understanding of the facts on these issues requires a review of the working arrangements between Mautner-Glick and Dominick Campagna during his lifetime, and between Mautner-Glick and Jeanne Campagna after his death, as outlined in that part of the depositions placed in evidence, the testimony and exhibits.[4]

As briefly noted above, Mautner-Glick was in the real estate business, serving two primary functions. It owned itself (or through subsidiaries) parcels of real estate for investment, for its own account, and managed them (collecting rent and paying taxes, repairs, insurance and other expenses). It also served as managing agent for real estate held by others for investment. In at least some instances, and certainly for the real estate involved in this suit, its services began with the physical renovation of old buildings that were structurally sound, stripping them to structural members and installing new heating, plumbing, electrical and air-conditioning equipment, carpentry, kitchen and bathroom fixtures and appliances, replastering, painting and other finishes to make the unit ready for occupancy on a turn-key basis. It would then rent the units and manage the investment for the owners, as it did for its own real estate, collecting rents and paying expenses.

In a number of these outside ownership projects, individual principals of Mautner-Glick, such as Mr. Mautner or Mr. Glick or others had a share of the investment along with outside investors.

This part of the case focuses on the renovation work, and the function of Dominick Campagna during his lifetime, as well as that of his widow after his death.

The association between Mautner-Glick and Mr. Campagna went back some 10 or 12 years before his death on November 9, 1971, having begun at the request of his older brother who was in the same line of work.

It was testified that Mr. Campagna's function was to perform the work to be done by him, and to supervise the work of other trades that he did not do. He was to be paid a total sum for the work he undertook to do and for the supervision or coordination, which sum was agreed on in advance. Mautner-Glick paid the outside suppliers or contractors directly, in addition to the sum to be paid to Campagna (see Tr. 7/7/78, p. 115, 1.1. 7–22).

The outside trades paid by Mautner-Glick over and above the Campagna contract sum, were identified as electric, plumbing (and heating), electric fixtures, kitchen fixtures, air conditioners and air conditioner sleeves, and painting, see Tr. 7/7/78, p. 115, 1. 11 to p. 117, 1. 16; p. 118, 1.1. 13–17), although he supervised that work as part of his contract.

Thus, aside from the details and miscellaneous disputes in the record, the underlying framework appears to be that Mr. Campagna would agree to supervise or coordinate all the trades and work involved in renovation or reconstruction, undertake performance of some aspects of the work himself, and with his own work crews, all for some agreed total; but with Mautner-Glick itself paying the cost of trades he did not perform but merely supervised or coordinated.

The contracts with Mr. Campagna were oral, except for the one for 204–206 E. 25th St. (which was assigned to DiJon Construction); that one was a written contract with Mr. Campagna because there was a "strange" (outside Mautner-Glick?) partner.

4. At trial, Mrs. Campagna's lawyer sought to have all of the depositions (or at least her deposition) considered as trial evidence. The United States objected, and the court had no choice but to have her testify again, Tr. p. 10, 1. 10 to p. 12, 1. 19.

Later in the trial, the United States offered designated excerpts from the deposition testimony of Alvin Glick, see Tr. p. 79, 1. 25 to p. 86, 1. 1, without objection. These excerpts were marked by pencil bracket on the court's copy of the deposition.

No other party sought to require that the remainder of the Glick deposition testimony be received. Fed.Ev.Rule 106.

Except for a few passages read on cross-examination of Mrs. Campagna by the United States, the rest of the depositions taken was not offered and received in evidence.

During the 10–12 year period that Mr. Campagna did work on oral contracts with Mautner-Glick, there were not any progress payments made on any scheduled basis as is common in construction contracts, such as an amount or percentage as various natural stages of the work are completed, with a percentage retained until the end. Instead, there were simply requests (evidently oral) from Mr. Campagna for $X in a particular lump sum, un-itemized and without detail to indicate what it was for, and Mautner-Glick would issue a check. Alvin Glick testified that he visited the project sites regularly and so was familiar with the progress. After his death, Mautner-Glick established a ledger captioned "Advances for D. Campagna", using a printed form evidently designed for reports to "OWNER", in the name of "GE–Management Mortgages", possibly a separate but related company. Copies of these sheets, one for each month from November, 1971 through July, 1972, plus one for December, 1972, were marked in evidence as Exh. P–3. Two other sheets at the end of P–3 appear to be some kind of reconciliation for one property, 448 East 79th St. These two sheets along with two others were marked for identification as Exh. P–5, Iden., during the cross-examination of Alvin Glick (Tr. p. 162, 1. 19 to p. 166, 1. 2), but were never marked in evidence as such. In any event the December, 1972 item does not appear on either of the two sheets for 448 E. 79th St., at the end of Exh. P–3.

So far as wages of workmen are concerned, the testimony is that when Mr. Campagna was hospitalized for what became his last illness, John Costello filled in as supervisor, although all other arrangements evidently continued as before, whatever they were.

When Mr. Campagna died, new arrangements were made. Based on the "Memorandum of Understanding" dated November 16, 1971 (Exh. P–1 in evidence), the ledger sheet mentioned above was established. According to Exh. P–3, which is not the original ledger sheet but a summary prepared by Mautner-Glick, the ledger

account was credited with $10,000. for 448 E. 79th St., $5,000. for 505 E. 83rd St., and $15,000. for 521 E. 88th St., these being the same as, in the case of 505 E. 83rd St., but different than, in the cases of 521 E. 88th St. ($25,000) and 448 E. 79th St. ($92,500) the recited balances in par. 4 of the Memorandum of Understanding, Exh. P–1. The original oral contract prices recited in that same paragraph were $95,000. each for 505 E. 83rd St. and 521 E. 88th St., and $117,-500. for 448 E. 79th St.

The entries mentioned are in the lower left hand corner of each sheet in the column "Remarks" rather than "Received". Later sheets show similar entries for specific buildings, as well as one entry for a building not mentioned in the Memorandum (Exh. P–1, December, 1971, 1666 1st Ave.), but without indication whether these are additional credits or what they are. All of these entries through July, 1972 (including two handwritten entries for December, 1971) add up to $92,346.90, which is less than the total balances recited in par. 4 of the Memorandum. This total does not reconcile at all with the entries headed "Deposits toward Construction" listed on the last 2 pages of Exh. P–3, which relate only to 448 E. 79th St., and which total $149,-809.32 through July 23, 1972.

Even if deposits toward construction entered through November 5, 1971 (during Mr. Campagna's lifetime) are deducted, the total deposits received after his death come to $119,809.32 for one building alone, and well in excess of the recited balances of $92,346.90 in par. 4 of Exh. P–1, for all three buildings.

No witness explained this discrepancy, and the court finds that the difference represents funds received from building owners to pay for trades and suppliers that were not within the scope of the Campagna contracts, such as electric, electric fixtures, plumbing, heating, air conditioning and sleeves, kitchen fixtures, painting, etc., which Mr. Campagna was to supervise or coordinate, but which Mautner-Glick was to

**580**

pay for in addition to the Campagna contract price.[5]

The monthly sheets on Exh. P–3 display other entries, evidently charged against the Campagna ledger account but not properly so, in view of Mr. Glick's testimony about the scope of the contracts. Some of these are noted here:

| | | |
|---|---|---:|
| November, 1971 | L & P Electric | $ 222.56 |
| March, 1972 | Tod Electric Co. | 1,000.00 |
| April, 1972 | DiJon Construction | 555.10 |
| | Tod Electric Co. | 1,000.00 |
| | DiJon Construction | 531.60 |
| May, 1972 | DiJon Construction | 387.40 |
| | Purchase Lamp Co. | 829.00 |
| | * Rockaway Fuel Oil | 4,000.00 |
| June, 1972 | DiJon Construction | 2,141.56 |
| | Tod Electric | |
| | "paid in full" | 1,400.00 |
| | Unity Stove Co. | 1,000.00 |
| July, 1972 | Unity Stove Co. | 900.32 |
| | L & P Electric | 2,482.40 |
| | Tod Electric | |
| | "bal. in full" | 1,049.00 |
| | Total | $17,498.94 |

* [Rockaway Fuel Oil was identified by Mr. Glick as a plumbing (and heating?) contractor, Tr. 7/7/78, p. 210, 1. 1, 2 to 15.]

DiJon Construction was a company in which one Arthur DeSissa and John Costello (the supervisor) became partners, Tr. 7/7/78, p. 158, 1.1. 17–18, to whom the only written contract, on 204–206 E. 25th St. was assigned, Tr. 7/7/78, p. 157, 1. 25 to p. 158, 1. 2, and in which buildings Mr. Glick and a Leo Lemley were also partners, Tr. 7/7/78, p. 158, 1. 24 to p. 159, 1. 7.

Many names on these sheets are names giving no clue to indicate what the payment was for. None of the checks or supporting bills was produced (except for the weekly checks to plaintiff, Exh. P–2 in evidence). Checks representing payments to Mr. Campagna during several months before his death were in the hands of the witness Glick, but were never marked in evidence (except for three, 07619 of Oct. 1, 1971,

07932 of Oct. 21, 1971, and 08296 of Nov. 4, 1971, part of Exh. P–6 in evidence), see Tr. 7/7/78, p. 192, 1. 5 to p. 195, 1. 12.

In par. 5 of the Memorandum, Exh. P–1, it is recited that "the said balances may be consolidated, rather than be restricted to the amount due on each property . . ." The monthly summary sheets, Exh. P–3, follow that recital. The sheets for November and December, 1971 and January, 1972 carry notations at the lower left with street addresses; the others carry none. Since the items listed as expenditures carry no notation of the parcel of real estate involved (much less a date and check number), these entries can be examined endlessly and fruitlessly to find out which building received the benefit of the expenditure.

At his death on November 9, 1971, Mr. Campagna had contracts on 6 buildings, according to Alvin Glick's testimony, of which only 3 came within the Memorandum, Exh. P–1. The November expenditures to the New York State Income Tax Bureau ($364.50), City of New York ($103.70), New York State Unemployment Insurance ($201.31) and Internal Revenue Service ($3,832.25) were in payment of withholding, F.I.C.A. tax and other taxes for the third quarter of 1971, i. e., from July through September, 1971 and these probably include expenses attributable to all six buildings, and possibly other buildings on which Mr. Campagna had contracts that were completed in that quarter. The same would be true to a lesser extent for corresponding disbursements on the January, 1972 summary sheet, since these were for the fourth quarter of 1971 (October, November and December), for part of which time Mr. Campagna had contracts on at least the 6 buildings.

There are similar defects in the weekly payroll sheets of workmen and wages, Exh. P–4. These sheets, which begin with the week ended November 12, 1971, a Friday

5. The court is not unaware that the "Summary" block on the monthly sheets shows one or more entries for the lines "Total Collected", "Other Monies Received" or "Gross Receipts", but except for the first three sheets, where these entries equal the total of the amounts *typed* for each building in the lower left hand corner, nothing on the sheets gives any indication of what the entry represents or its source.

and the same week in which Mr. Campagna died, were prepared by John Costello, the supervisor. They list names of workmen in the first column, and the number of hours worked on each of 6 days of the week (Friday of one week through Thursday of the next, omitting Sunday). The next column, "Hours", gives the total hours for the week. On the right side of each sheet there are extensions, in dollars and cents, of what Alvin Glick said were the net wages after withholding for each workman.

On the sheets for the weeks ended November 12 and 19, 1971, Alvin Glick testified that he calculated the extensions of net wages. The extensions on the remaining sheets were calculated by an employee of Mautner-Glick. Alvin Glick said that Mrs. Campagna provided Mautner-Glick with the hourly rates or weekly salary (?) for each workman, at the start, and after that calculating the extensions was a simple mathematical task: "It was easy to do after the cookie cutter was set". See Tr. p. 186, 1. 10 to p. 187, 1. 20.

It may well be that the extensions were calculated easily, but it does not follow that they were done correctly, and whether they were or not cannot be completely checked from any inspection of the time sheets and extensions. The basic hourly rate is not given. The exemptions claimed on W–4, needed to determine federal, state and city withholding tax are not shown. The breakdowns of withholdings for federal, state and city income tax and for FICA tax, are not shown. There are evidently no withholdings for overtime pay (these are the round dollar amounts shown as a "plus" after the dollars and cents of net wages for the first 40 hours), and it is impossible to tell whether the overtime was calculated at straight time or time-and-a-half. A few experimental calculations indicate that the overtime pay is at straight time because otherwise the imputed basic hourly rate would involve fractions of a cent.

Not only are there no withholdings on the overtime pay, but the only sheet that carries a total (the first one, for November 12) gives a total for only the net wages after withholding for up to 40 hours, and does not include the overtime pay at all. The total of $2,191.14 which is shown, plus $250. for John Costello, adds up to $2,441.14, the same amount shown on the third line of the November, 1971 summary sheet for November, 1971, Exh. P–3, as "Cash-P/R" (for "payroll").

By Alvin Glick's claimed understanding, John Costello was to serve as Mrs. Campagna's employee, yet he was paid a gross amount without deduction or withholding.

The same is true for others. Thus, on the same first sheet for November 12, 1971, the eighth entry, for "Mike Penna, Carp" [enter] shows 8 hours for each of five days, for a total of 40 hours, and a wage of $200., which implies a rate of $5. an hour, gross. There cannot be withholding on this item because the FICA tax rate of 5.2% alone would produce a figure that would not round out to even dollars.

The 16th entry on that page, for "Joe, Bricklayer", shows 16 hours worked and $100. wages, which works out to $6.25 per hour. This, too, is obviously a gross wage without withholding, rather than a net "take home" pay.

The last entry on the same page, for "Carlo, Lather", does not even enter hours worked, but shows $45 a day for 6 days for a total of $270. There is obviously no withholding.

Similar improper and incorrect bookkeeping appears on the second sheet of Exh. P–4, the extensions of which were calculated by Alvin Glick. The so-called net wages before overtime are not totalled on the sheet. The court's total shows $1,500.88, plus $250 for John Costello, or $1,750.88; and if the overtime be added, the total is $1,970.88; yet none of these totals corresponds to the entry for "Cash-P/R", of $1,532.13 on line 11 of the November, 1971 summary sheet, Exh. P–3. Again, on that sheet and on later sheets, Mike Penna the carpenter, Joe or Tony the bricklayer and Carlo the lather are listed for round dollar wages, obviously gross rather than net after withholding.

Workmen who put in more than 40 hours are not likely to accept "take home" pay after withholdings for only 40 hours. Since the overtime is listed without withholding or deduction, the inference is clear, obvious and strong, and the court so finds, that John Costello was paying the workmen their overtime in cash, "on the side" or "under the table", in gross, without deduction, and with the intention that these amounts not be reported. Of necessity Costello knew it, the workmen knew it, and Mautner-Glick knew it because the payroll checks given to Costello and cashed by him did not include the overtime pay. All three also had to be aware that Costello and some workmen were being paid gross wages without deduction for required withholdings, city, state and federal.

Not only that, but since the payroll checks matched with payroll sheets by the court do not include the overtime (aside from their failure to reconcile), the money to pay the overtime "under the table" had to be obtained by Costello in other ways. There are enough entries of payments to John Costello in varying amounts, or to Accord Carting (another of his enterprises, as Alvin Glick knew) as well as to DiJon Construction (also a Costello enterprise) to provide the means for this maneuver on a false billing basis.

For all these reasons, the court finds that the monthly summary sheets, Exh. P–3 and the weekly payroll sheets, Exh. P–4 are false and unreliable records.

Under the terms of the Memorandum, Exh. P–1 Mautner-Glick undertook to pay "moneys due for work, labor and services, or materials furnished, to the extent of the aforesaid balances due and owing thereon." Alvin Glick testified that Mautner-Glick was to handle the bookkeeping for the ledger account, "Advances for D. Campagna." [6]

The obligation to pay moneys due for labor is construed to refer to the gross amount, and thus includes both the net wages and the amounts required to be withheld. Mautner-Glick was hardly unfamiliar with the calculations, records and bookkeeping required for payroll purposes. It had its own office employees for whom payrolls had to be prepared, and someone who knew how to do it. Alvin Glick was Secretary-Treasurer of Mautner-Glick, was obviously experienced, visited the work sites regularly, and could hardly have been unaware of the applicable requirements.

Thus, if a workman earns $200. gross, the entire $200 belongs to him. The tax laws being what they are, he cannot be paid the entire $200. Various amounts must be deducted by law as withholdings for income taxes at the federal, state and city level. Other taxes, such as FICA taxes, must also be withheld.

Thus, Mautner-Glick had several obligations to Mrs. Campagna under the arrangement reflected by the Memorandum, Exh. P–1, and Alvin Glick's testimony. One was to pay the labor, which is the gross amount. The other was to do the bookkeeping for the withholdings, and to see to it that these withholdings were applied to discharge Mrs. Campagna's obligations and responsibilities to the various taxing authorities.

This could have been done in the usual way, as exemplified by the breakdowns prepared by Mr. Schwartz, Exh. T–1 and T–2, for the 3rd and 4th Quarters of 1971. These show, for each workman, the gross wages, the FICA tax, the federal, state and city withholdings for income tax (separately) and finally the net (take home) pay. The net take home pay should, of course, reconcile with the payroll checks to John Costello.

6. The evidence is quite clear that the Memorandum, Exh. P–1, was prepared either by Alvin Glick or some other person at Mautner-Glick, or by someone acting for it, and not by anyone acting for or in the interests of Mrs. Campagna, and the court so finds. In this circumstance, taken together with the wholly disparate bargaining positions and the then sole knowledge

of Mautner-Glick about the actual terms of the oral contracts, the exact scope of the work, the agreed price, the actual status of the work at death, and the like, any uncertainties arising out of this document must be resolved against Mautner-Glick and in favor of Mrs. Campagna. It is also noted that the "Memorandum" does not purport to be an "integrated" instrument.

Mautner-Glick also had to know that withholdings for Federal income tax plus both the employer's and employee's shares of FICA taxes are required to be deposited during the quarter; Line 20 of the Form 941 (Exh. G–7 and G–8) call for this, and Line 21, "Undeposited Taxes Due" should be less than $200.

Yet, no document prepared by Mautner-Glick and marked in evidence provides the information needed for making such deposits and final quarterly payments, nor any expenditures (aside from the ones for the 3rd and 4th Quarters of 1971) to account for payment of the wages in full.[7]

It could have done this in one of two ways: (1) it could have supplied Mrs. Campagna with a check to cover withholdings from wages for labor, with instructions that the sum was for payment to the various tax agencies, or (2) it could have drawn its own checks for that purpose (to assure that the funds were applied as intended) and deposited them with the appropriate deposit form. In either case, it would have been obliged to furnish Mrs. Campagna with breakdowns, like those of Exh. T–1 and T–2, so that the proper returns could be made. It did neither.

The court also finds that if the monthly summary sheets (Exh. P–3) and weekly payroll sheets (Exh. P–4) had been examined by Mr. Schwartz, the accountant (whom no one called to testify either on depositions or at trial) he would have been unable to prepare correct federal, state or city returns, from the information recorded.

There are further difficulties with the Memorandum, Exh. P–1, the monthly summary sheets, Exh. P–3, and the payroll sheets, Exh. P–4, and the testimony of Alvin Glick. For example, whatever the arrangement with Mrs. Campagna might have been, Mautner-Glick as managing agent for the fee owners of the buildings (see par. 5, Memorandum, Exh. P–1) was necessarily obliged to make and maintain records and accounts of the expenditures

for reconstruction or renovation on a building-by-building basis, even when the fee owners were the same, because such expenditures would necessarily be capital expenditures going to the establishment of the cost basis for each building, the calculation of allowable depreciation and the determination of capital gains and losses. The fee owners of each building appear to have been individuals, holding title as tenants in common, or in a partnership or joint venture. Such investment vehicles, like limited partnerships and real estate investment trusts, have been attractive ones for individuals in high income tax brackets largely because of the pass-through features of accelerated depreciation and the conversion of what would be ordinary taxable income into capital gains. In many cases, the depreciation allowance in early years is large enough to generate operating losses which can offset otherwise taxable income, and still provide cash flow for distributions.

The court finds it incredible that, as a managing agent for such fee owners, Mautner-Glick did not establish reliable records, sufficient to withstand audit, for the capital expenses chargeable to each building.

Not only that, but Mautner-Glick evidently commingled all funds in respect to all buildings in a single checking account, which the only checks in evidence, Exh. P–2 and Exh. P–6, show was an account at First National City Bank, # 0210–0008–0361710, in the name of "Mautner-Glick Corp., Management Account", with the address 1484 First Avenue, New York, New York, 10021 (which address, the court observes, is the same address typed as the address of "D. Campagna", on the last two sheets of exh. P–3).

During cross-examination of Alvin Glick, Mrs. Campagna's attorney pressed repeatedly for identification of some other bank account, and the witness repeatedly said there was only a single checking account, with "ledger sheets", which the

---

7. All of the third quarter, and one month and 9 days of the fourth quarter, were during Mr. Campagna's lifetime and the corresponding taxes should not have been charged as they were.

court suggested as a semantic solution, to allocate funds received and disbursed. On further deliberation, and inspection of the exhibits, the court now finds that there was in fact another account, not disclosed. This finding is based on a careful review of Alvin Glick's testimony and inspection in particular of the last two pages of Exh. P–3. The left hand column on those sheets shows dates, check numbers and dollar amounts in round thousands (except for the last entry) under "Paid on Account." These checks cannot represent the itemized disbursements shown on the monthly summaries, because these were described as separate checks. They can only represent funds received from fee owners or mortgagees and deposited in a clearing account, from which they were drawn for deposit in the "Management Account" for disbursement to pay individual bills. There would be no sense or point in drawing a check on the "Management Account" in order to redeposit that check in the very same account on which it was drawn.

Even assuming as true Alvin Glick's testimony that the contracts with Mr. Campagna were oral (except for 204–206 E. 25th St., no copy of which was produced), it strains credulity that there should be no records or other documentation to reflect the nature and scope of those oral contracts or their amounts. So far as the testimony goes, Alvin Glick was the only witness in a position to say what the terms of each contract were, what the scope of the work was, and what the extent of completion was at Mr. Campagna's death. His testimony in these respects, having to do with conversations and "hand shake" agreements with a person now deceased, were not corroborated in any way. A finder of fact is inevitably obliged to scrutinize the testimony of a survivor with great care under such circumstances, see *Morgan, Chafee* and others, "The Law of Evidence, Some Proposals for Its Reform" (Commonwealth Fund, 1927).

Alvin Glick's testimony does not withstand such scrutiny. Aside from the fact that compliance with tax laws on cost basis and depreciation would command far better records than were produced, there had to be plans and specifications for each building reconstruction in order to file for and obtain the inevitable string of municipal permits. Nor is there any mention of mortgage funds, which is quite remarkable since investments of this kind are rarely, if ever, undertaken at 100% equity, because mortgage financing increases the "leverage" of the equity investment.

Thus, on the matter of credibility, the court finds Alvin Glick's explanations and exhibits entitled to little weight. This is not to say that what he spoke was false, in and of itself. It is to say that what he testified to was selected, arranged and charged with purpose to support his position. He told far less than "the whole truth."

One example illustrates this well. When asked about the buildings on contract at Mr. Campagna's death, he said, in part:

"On 204 and 6 East 25th Street she actually assigned the contract to—the name comes to me now—DiJohn [sic] Construction." [Dep. 6/29/77, p. 22, 1.1. 19–20, received in evidence at trial, Tr. 7/7/78, p. 81, 1.1. 19–23].

As his testimony at trial discloses, he well knew who the contract—the only written contract—was assigned to, and knew it was done in his office, and that John Costello was a principal in that company as well as in Accord Carting. In many instances Mr. Glick was evasive, argumentative and less than candid. His attempts to attribute to Mrs. Campagna knowledge, awareness and understanding about her recently deceased husband's business matters—grounded on no personal knowledge of his—are not credible and the court rejects them on that ground. The testimony in this category is especially unpersuasive because if the fact were that she did have that knowledge, awareness and understanding, she would not have signed the Memorandum, Exh. P–1, or, having signed it, she would have begun asking a great many questions when she received the first of the monthly summaries and the first of the payroll sheets. The questions would have been obvious, and

the answers cannot be found from what scanty information the documents disclose.

Finally, if in fact Mautner-Glick was the employer rather than Mrs. Campagna, it would be in its own interest and adverse to hers, to make, keep and disclose only records and facts tending to protect itself and prejudice her vis-a-vis the United States.

The applicable principles of law in circumstances like these have been long established and are recognized everywhere. They are conveniently gathered in the opinion of Judge Lacey in this District, *In re Mid-Center Redevelopment Corp.*, 383 F.Supp. 954 (D–NJ, 1974); at pp. 971–973, beginning with the classic quotation of then Judge Cardozo, defining as well as it ever has been, the constructive trust doctrine, in *Beatty v. Guggenheim*, 225 N.Y. 380, at 386, 122 N.E. 378 (1919), and citing other precedents and leading scholars.

The arrangement here, as reflected by the Memorandum Exh. P–1 and the credible testimony, was one in which Mautner-Glick undertook to serve as Mrs. Campagna's agent in the handling of the funds on the three buildings, and doing the necessary bookkeeping and accounting. The relation was one of trust and confidence placed in Mautner-Glick, and especially in Alvin Glick, by her. That trust and confidence were betrayed.

■ The relationship of an agent to his principal is not that of mere debtor and creditor, but is one of a fiduciary nature. The agent is held to a high standard of honesty, must admit to no selfish interest and cannot delegate the performance of discretionary duties. *Marti v. Standard Fire*, 127 N.J.L. 591 at 593–594, 23 A.2d 576 (E & A, 1941). (insurance company agent).

An agent stands in a fiduciary relationship to his principal, and is under a duty to be careful, skillful, diligent and loyal in the performance of his principal's business and for failure so to act he subjects himself to liability to his principal. *Marchitto v. Central R. Co.*, 9 N.J. 456, at 466, 88 A.2d 851 (1952) (chairman of railroad brotherhood's general grievance committee).

■ Even on who undertakes *gratuitously* to act for another in a matter of trust and confidence shall not, in the same transaction, act for himself against the one relying on his integrity. *Mianulli v. Gunagan*, 32 N.J.Super. 212 at 217, 108 A.2d 200 (App. 1954) (neighbor acting for himself and another neighbor in buying an intervening lot).

■ An agent is not permitted to assume two distinct and opposite characters in the same transaction, in one of which he acts for himself and in the other pretends to act for his principal. The law on this subject rests on the highest considerations of justice and safety. *Strong v. Strong*, 134 N.J.Eq. 513, at 521, 36 A.2d 410 (Ch.1944) *aff'd* 136 N.J.Eq. 103, 40 A.2d 548 (E & A 1944) (husband acting as agent for wife and using a corporate entity to conceal his self-interest).

Officers of corporations are held to the same standard when acting for the corporation in connection with corporate dealings with others. *Hirsch v. Phily*, 4 N.J. 408, at 416, 73 A.2d 173 (1950) (pledgor of accounts receivable acting to collect on behalf of lender/assignee).

■ When an agent places himself in a position where his own interests may conflict with those of his principal, courts do not stop to inquire whether the agent has obtained an advantage or not, or whether his conduct has been fraudulent or not. It is enough to show that he has attempted to assume two distinct, opposite and conflicting characters in the same transaction. *Porter v. Woodruff*, 36 N.J.Eq. 174, at 179–180 (Ch. 1882) (agent to assist elderly widow in management of her estate).

■ In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or, in fact, reasonably exists, the *burden of proof* is thrown upon the person in whom confidence is reposed, and who has acquired an advantage, *to show affirmatively*, not only that no deception was practiced therein, no undue influence used, *and*

586

that all was fair, open and voluntary, *but also that it was well understood. Hirschmann v. Hirschmann,* 135 N.J.Eq. 23, at 27–28; 37 A.2d 50 (Ch.1944), *aff'd,* 136 N.J.Eq. 230, 41 A.2d 13 (E & A 1944) (relatives operating pharmacy and holding life policies for military serviceman pending his return). To the same effect, see *Dessel v. Dessel,* 122 N.J.Super. 119, at 122–123, 299 A.2d 410 (App.1972), *aff'd,* 62 N.J. 141, 299 A.2d 409 (1973).

See, also, 3 *Am.Jur.2d,* "Agency", § 198–§ 205; *Restatement of Agency, Second,* Title C, "Duties of Loyalty", § 387–§ 393, and cases cited in Restatement in the Courts.

■ Taking all of the testimony and exhibits as a whole, the court finds that Mrs. Campagna has established by clear and convincing proof that there was a relationship of trust and confidence between herself and Mautner-Glick, acting primarily through Alvin Glick (its secretary-treasurer), and that Mautner-Glick utterly failed to carry the burden of proof arising therefrom. It not only failed to show affirmatively that no deception was practiced, no undue influence used and that all was fair, open and voluntary, but it made no credible attempt to show that what was done was well understood. The scanty and inadequate documents it claims to have furnished Mrs. Campagna fall far short of meeting that burden. As analyzed above, a trained and sophisticated person could not well understand them or the transactions they purport to reflect. What they do show is a likelihood that the "Advances for D. Campagna" ledger account was charged with items not chargeable and, of most significance within the framework of the pleadings, that Mautner-Glick did not "pay" the "labor", i. e., the total gross wages. There was no attempt to confirm or verify the accuracy of the asserted oral contract prices, or of the supposed "balances" credited when the ledger account, if there really was one, (original records were not produced) was opened.

Under these circumstances, Mrs. Campagna, while unable to establish her claim for refund from the United States (largely, the court believes, for lack of support from Mautner-Glick in another breach of duty) is entitled to have judgment against Mautner-Glick on her counterclaim for indemnity, in the full amount of all federal withholding taxes and FICA taxes paid by or collected from her for the fourth quarter, 1971 and the first and second quarters, 1972 (including all charges for late payment, interest, penalty and the like), together with interest thereon from the date of each payment to the date of December 31, 1978 at the rate of 10%, which the court finds will reflect a fair average of applicable interest rates over the period, and at 12% thereafter and on the judgment to reflect the level of current rates.

Against that, Mautner-Glick will have credit in its favor in the amount of $4,638.07, paid by it in January, 1972 for the 4th Quarter of 1971, as well as for such amount of the FICA tax (i. e., 5.2% of taxable wages) as represents the tax separately imposed on the employer and not deductible from the employee's wages. The net principal amount to be reimbursed shall be first established, the IRS charges paid prorated and a total obtained, and then interest shall be calculated thereon from the date of each payment.

The counterclaim by Mautner-Glick against Mrs. Campagna for $11,545.11, alleged expenditures above the oral contract prices, is decided by awarding judgment thereon in favor of Mrs. Campagna and against Mautner-Glick, for the same reasons as judgment for indemnity is to be entered in her favor. No such overrun was established by credible proof.

The refund claim against the United States is less easily disposed of. It appears from the record that a delegate (IRS) of the Secretary of the Treasury prepared and filed Form 941 returns on behalf of Mrs. Campagna for the 4th Quarter of 1971 and the 1st and 2nd Quarters of 1972. These returns evidently showed larger taxes than the Form 941 returns that were filed (and, for the 1st and 2nd Quarters of 1972, not paid at all). The "delegate" returns themselves were not marked in evidence.

What was marked at trial were "assessments", which are prima facie evidence, but which are even less comprehensible than the Mautner-Glick exhibits, and which the court finds useless for the purpose of establishing the amounts.

Also, at trial, the United States informed the court that the assessment for the 4th Quarter of 1971 was too high since Mrs. Campagna clearly was not an employer, in any sense, before her husband's death on November 9, 1971. The excess was estimated at some $5,000., and the record was left open to furnish a corrected exhibit. That exhibit was received April 10, 1979, and the court has marked it as Exh. G–10 on that date, for inclusion in the exhibit file. The new exhibit is less comprehensible than G–1, 2 and 3.

The attorneys for the parties are accordingly directed to meet and work out the figures in accordance with the foregoing opinion. The United States is in the best position to do this with assistance from IRS. If, in fact, there was an overpayment, judgment on the refund claim will be entered in favor of Mrs. Campagna for the amount of overpayment and extra charges attributable to it. If, on the other hand, the overassessment merely reduces the total, yet leaves a balance of tax payable, then judgment will be entered in favor of the United States and against Mrs. Campagna on both her refund claim and, to the extent of the balance due, on the counterclaim of the United States.

Finally, the third-party claim by the United States against Mautner-Glick is decided by granting judgment against the United States and in favor of Mautner-Glick.

## SUPPLEMENTAL MEMORANDUM

Since the decision in this case, the parties have been unable to prepare a final judgment on which they could agree, partly because of differences in calculating the components of the amounts paid by Mrs. Campagna to IRS, and partly because the credit to Mautner-Glick incorrectly embraced its payment for all of the 4th Quarter of 1971 rather than the period from November 9, 1971 when Mr. Campagna died to December 31, 1971, the only period in that year for which IRS could assert a claim against Mrs. Campagna. Also, it appears that initially IRS assessed an additional tax on Mrs. Campagna for the entire 4th Quarter of 1971, and it has since then recalculated her liability to a sum less than was paid, resulting in a refund to her.

The parties have now appeared to present data and their views in regard to the judgment and the various amounts, and these are resolved here.

The analysis begins with the amounts collected by IRS from Mrs. Campagna, and these are in disagreement as between IRS and Mrs. Campagna.

IRS says it collected $3,500 on December 12, 1974, and $12,928.33 on August 17, 1976, for a total of $16,428.33. Mrs. Campagna says that $3,542.65 was paid April 7, 1975 and $13,228.33 was paid on August 13, 1976, for a total $16,770.98.

The differences are explained as follows:

(1) The $3,500. was levied on a bank account in that amount in December, 1974, but was not collected until April, 1975 by which time one quarter's bank interest had accrued. Figured at 5%, that difference would amount to $43.75, which is very close to the difference of $42.65, given that the bank's interest rate is not known. The variation is de minimis, not worth the taking of further proofs, and Mrs. Campagna will be credited with a payment of $3,542.65 to IRS on April 7, 1975;

(2) The 1976 payment represented Mrs. Campagna's equity in the sale of a dwelling on which a lien claim had been asserted by the United States. The sale could not be closed without an agreement by the United States to have its lien transferred to the sale proceeds. Before agreeing to this, the United States required Mrs. Campagna to submit two appraisals to justify the reasonableness of the sale price. The two appraisals cost $300., which is the amount of the difference between the two amounts, $12,928.33 and $13,228.33. The difference in dates, August 13 and August 17, 1976,

doubtless represents the difference between the date the check was given and the date it cleared.

Since IRS was entitled to be assured of the reasonableness of the price before agreeing to transfer its lien to the sale proceeds, the $300. expense must fall on Mrs. Campagna as between her and IRS, and since checks are not legal tender, the clearing date will be taken as the payment date. Thus, Mrs. Campagna will be credited with the payment of $12,928.33 on August 17, 1976.

However, since there would have been no assessment of tax, penalty interest and interest against her had Mautner-Glick discharged the obligations found in the main ruling, she is entitled to be reimbursed the $300. expense from Mautner-Glick.

According to IRS, the payments collected from Mrs. Campagna were credited as follows:

| | | |
|---|---|---|
| 4th Q., 1971: | 12/12/74 | $3,500.00 |
| | 8/17/76 | 2,482.19 |
| | | $ 5,982.19 |
| 1st Q., 1972: | 8/17/76 | 7,801.88 |
| 2nd Q., 1972: | 8/17/76 | 2,644.26 |
| Total: | | $16,428.33 |

In view of the rulings above, these entries will be corrected as follows:

| | | |
|---|---|---|
| 4th Q., 1971: | 4/ 7/75 | $3,542.65 |
| | 8/17/76 | 2,439.54 |
| | | $ 5,982.19 |
| 1st Q., 1972: | 8/17/76 | 7,844.53 |
| 2nd Q., 1972: | 8/17/76 | 2,644.26 |
| Total: | | $16,470.98 |

The difference between these totals is the evident interest on the bank account of $42.65.

---

Upon review of the figures furnished by letter and at the hearing, the court finds that the correct amount of taxes and penalty interest as between IRS and Mrs. Campagna are as follows:

| Period | WT (A) | FICA (B) | FICA (C) | Penalty/Int | Total |
|---|---|---|---|---|---|
| 4 Q 71 | 1,180.72 | 259.35 | 259.35 | 1,030.36 | 2,729.78 |
| 1 Q 72 | 2,506.90 | 834.43 | 834.44 | 3,620.17 | 7,795.94 |
| 2 Q 72 | 863.60 | 286.21 | 286.21 | 1,208.24 | 2,644.26 |
| Totals | 4,551.22 | 1,379.99 | 1,380.00 | 5,858.77 | 13,169.98 |

---

Since the correct total collectible from Mrs. Campagna by IRS was $13,169.98, while the total collected was $16,470.98, a refund of $3,301.00 is payable to her from the United States, with interest at the rate set by law from August 17, 1976.

In respect to the reimbursement from Mautner-Glick to Mrs. Campagna, Mautner-Glick is entitled to a credit for the withholding tax, and both the employees' and employer's FICA taxes chargeable to her and paid by it of $1,699.42, as shown on the above table of amounts found. Of this total, $259.35 was the employer's FICA tax chargeable in any event to Mrs. Campagna, leaving $1,440.07 as part of the "wages" payable by Mautner-Glick under the agreement between them. Applying the ratio $1,440.07/$1,699.42 to the penalty/interest of $1,030.36, results in $873.12 of that total chargeable to Mautner-Glick and reimbursable to her.

For the first quarter, 1972 on which all payments were made by Mrs. Campagna, the taxes totalled $4,175.77, of which $834.44 were chargeable to her and $3,341.33 is reimbursable by Mautner-Glick. Applying $3,341.33/$4,175.77 to the penalty/interest of $3,620.17 results in $2,896.75 of the penalty/interest being reimbursable to Mrs. Campagna.

For the second quarter of 1972, on which all payments were made by Mrs. Campagna, the taxes totalled $1,436.02, of which $286.21 are chargeable to her and $1,149.81 is reimbursable by Mautner-Glick. Applying $1,149.81/1,436.02 to the penalty/interest of $1,208.24 results in $967.43 of the penalty/interest being reimbursable to Mrs. Campagna.

In sum, the reimbursable amounts for that part of the "wages" that should have been deducted and paid by Mautner-Glick (withholding tax and employee's FICA tax),

and the prorated shares of the penalty/interest charged, are tabulated as follows:

| Period | Tax (A + B) | Share of Penalty/Interest | Total |
|--------|-------------|---------------------------|-------|
| 4 Q 1971 | – | 873.12 | 873.12 |
| 1 Q 1972 | 3,341.33 | 2,896.75 | 6,238.08 |
| 2 Q 1972 | 1,149.81 | 967.43 | 2,117.24 |
| | 4,491.14 | 4,737.30 | 9,228.44 |
| Appraisals | | | 300.00 |
| Total reimbursable, before interest | | | $9,528.44 |

As directed in the main ruling, this sum will bear interest at 10% from August 17, 1976 to December 31, 1978, an amount the court calculates at $2,260.72 for that period, plus interest on $9,528.44 at 12% interest from January 1, 1979 to the date of payment.

At the hearing on the settlement of the judgment, Mautner-Glick complained that the new figures and their application left it without full credit for the $4,638.07 paid by it for the entire 4th Quarter of 1971. The objection lacks substance.

In the first place, it was Mautner-Glick's failure to carry out its obligation to keep the books and see to proper application of the funds that led to the incorrect filing of a single 941 return for the 4th Quarter of 1971 when there should have been two: (1) a final return for Dominick Campagna for the period October 1 to November 9, and another for Jeanne Campagna (with her own employer number) from November 9 to December 31, 1971. It is the allocation of taxes, penalty/interest and reimbursements for this quarter that has been nearly intractable of solution.

In the second place, the court's calculations fail to make Mrs. Campagna whole, less the amounts chargeable to her, by $1,440.07, when the intention of the main ruling was that she should be so made whole.

She paid to IRS a total (including the $300 for appraisals) of $16,770.98. The payments to her by the judgment to be entered will provide $3,301.00 from the United States and $9,528.44 from Mautner-Glick, making a total of $12,829.44, or $3,941.54 less than she paid to IRS.

The non-recoverable items payable by her are as follows:

| Period | Tax | Penalty/Interest | Total |
|--------|-----|------------------|-------|
| 4 Q 1971 | 259.35 | 157.24 | 416.59 |
| 1 Q 1972 | 834.44 | 723.42 | 1,557.86 |
| 2 Q 1972 | 286.21 | 240.81 | 527.02 |
| Totals | 1,380.00 | 1,121.47 | 2,501.47 |

The total of $2,501.47 chargeable to her is $1,440.07 less than the $3,941.54 difference between what she paid IRS and what she recovers from the United States and Mautner-Glick combined.

There is obviously an error in the figures, since the final results should reconcile, which they do not, and since the error is in Mautner-Glick's favor, it cannot be heard to complain.

In fact, since the total of the non-recoverable items charged to Mrs. Campagna amount to only $1,380. in taxes, and since the first levy by the United States yielded more than $3,500., the court might well have charged Mautner-Glick with reimbursement to her of 100% of the penalty/interest instead of calling for a pro-rata division. Had Mautner-Glick properly discharged its duties (including the making of deposits for withholding and FICA taxes so as to leave no more than $200. due with each quarterly 941), the penalty/interest would have been negligible in amount.